471 A.2d 1102

Pilar LOWENTHAL, et al.

v.

Morton E. ROME, Personal Representative of the Estate of Jean Arthur Lowenthal.

No. 490, Sept. Term, 1983.

Court of Special Appeals of Maryland.

March 5, 1984.

Certiorari Denied June 25, 1984.

730

John D. Alexander, Jr., Baltimore, with whom were Allen, Thieblot & Alexander, Baltimore, on brief, for appellant, Lowenthal.

Ronald A. Silkworth, Baltimore, with whom were O'Connor, Preston, Glenn & Smith, P.A., Baltimore, on brief, for appellant Lindner.

Stephen C. Winter and Morton E. Rome, Towson, with whom were White, Mindel, Clarke & Hill, Towson, on brief, for appellee.

Argued before GILBERT, C.J., and LISS and ADKINS, JJ.

LISS, Judge.

The fundamental issues in this case are whether certain documents should have been admitted to probate by the Superior Court for Baltimore City (now the Circuit Court for Baltimore City) and how the documents should have been construed. As we consider these issues, we shall also review a number of subsidiary issues, as well as a motion to dismiss

one of the two appeals involved. Before explaining why we affirm the judgment below, we shall sketch the relevant facts and the major contentions of the parties.

*Facts*

Jean Arthur Lowenthal died in London, England on June 19, 1977. He was independently wealthy, having owned at the time of his death over $600,000 face amount in Rite-Aid Corporation debentures, as well as cash, securities, other investments, and an estate in Spain called the "Finca". Most of the assets (other than the Spanish real estate) were held by the Mercantile Safe-Deposit and Trust Company in Baltimore.

Although Jean Lowenthal was an American citizen domiciled in Maryland, for most of his adult life he resided abroad, spending much of his time in Spain. He had been married three times. His first marriage, to an American citizen in Baltimore, ended in divorce. His second marriage was to the nominal appellant Pilar Lowenthal. Jean Lowenthal had two children by Pilar, appellants Jean Arthur Lowenthal, Jr., and Maria Loretta Lowenthal, both of whom are American citizens residing in Spain. Jean's marriage to Pilar was annulled by Spain's highest court. The third marriage was to a Swedish countess, who predeceased Jean. Her child, Rolf Lindner, is Jean's stepson and another appellant.

At the time of Jean's death, his other immediate relatives were his brother, Albert Lowenthal, with whom he had remained in regular contact, and a sister whom he had not seen for many years.

On October 20, 1975, after the death of his third wife, Jean Lowenthal, then in Spain, purportedly executed a will in Spanish. According to the terms of this document, Lowenthal's assets in Spain were left to appellant Lindner. The remainder of the assets was left to Albert Lowenthal.

The next month, Jean Lowenthal traveled to the United States. There, on December 4, 1975, he executed an Ameri-

can will which also left the Spanish estate to Lindner, and all other property to Albert.

Three months later, back in Spain, Lowenthal on March 3, 1976, executed another Spanish document which left the Spanish estate to Albert Lowenthal, but which made no reference to assets in the United States.

On July 20, 1977, a petition for administrative probate of the will of Jean Arthur Lowenthal (the American will) was filed with the Register of Wills for Baltimore City by Albert Lowenthal, now deceased, and Morton E. Rome, decedent's personal representative and appellee herein.

Attached to the petition for administrative probate were the American will of December 4, 1975, the Spanish will of March 3, 1976, and a translation of that Spanish will. The petition for administrative probate offered only the American will for probate as the last will of the decedent. The petition for administrative probate then alleged:

> ... your Petitioners have been advised that the Decedent may have executed a later document, purporting to be a "Will" in Malaga, Spain, ... This purported "Will", in any event, if it exists, can be construed only as a Codicil to the attached Will, because the sole change is that the Decedent revoked a legacy to a son of a former deceased wife. ...

The petition for administrative probate requested appointment of the petitioners as personal representatives and assured the Register of Wills:

> ... in such case, they will make every effort to ascertain all the circumstances with reference to the existence of the mentioned purported "Will" executed in Malaga, Spain, and will be bound by it.

On the same day, the Register of Wills admitted the American will to administrative probate and the petitioners were appointed personal representatives. The Register of Wills did not docket the Spanish will of March 3, 1976.

Sometime between September 1, 1977, and September 8, 1977, the Register of Wills admitted the Spanish will of

March 3, 1976, to administrative probate and recorded it. At that time the American will, previously recorded, was marked "RECORDED IN ERROR—LETTERS OF ADMINISTRATION NOT GRANTED" with a cross-reference to the latest recording.

During a later conference with the Orphans' Court and the personal representatives, counsel for the Lowenthal children advised that there was material mistake and irregularity in the original administrative probate proceeding and contended that it was too late to probate the American will. The personal representative, in response, requested that the Orphans' Court correct "any clerical errors in the administrative probate," in which request Lindner joined. Sometime after October, 1979, the records of the Register of Wills were changed and mutilated to indicate that it was the prior American will that had been admitted to administrative probate.

On January 20, 1978, appellant Pilar Lowenthal, on her own behalf and on behalf of her two children, filed a petition for judicial probate, caveat and other relief, in which she sought to have judicially probated the Spanish will dated March 3, 1976.

The petition for judicial probate alleged, among other contentions, that the original petition for administrative probate was materially incomplete and incorrect, and that there was material mistake and substantial irregularity in that proceeding. Neither the surviving personal representative nor Lindner moved to set aside the prior administrative probate or to substitute judicial probate of the American will.

In their answer to the petition for judicial probate and other relief with respect to the Spanish will, the personal representative and Lindner argued that the administrative probate of the American will should remain in full force and effect.

The Orphans' Court dismissed Pilar Lowenthal's petition for judicial probate, caveat and other relief on October 20,

1978. She entered an appeal to the Superior Court of Baltimore City on November 14, 1978, and on September 25, 1979, the appeal was dismissed on the basis of the failure of appellant Pilar Lowenthal to transmit a transcript of the Orphans' Court proceedings. The appellant filed an appeal to this Court and we reversed and remanded the case to the Superior Court for a trial *de novo* of the petition for judicial probate. *Lowenthal v. Rome,* 45 Md.App. 495, 413 A.2d 1360 (1980).

The hearing *de novo* was held and by order dated October 22, 1982, the trial judge admitted to judicial probate both the American will of December 4, 1975, and the Spanish will of March 3, 1976. The trial judge concluded that pursuant to the Courts and Judicial Proceedings Article, Section 12–502, he had the power to consider the American will, the Spanish will, or both, and to revoke, modify or confirm any prior administrative or judicial probate action taken regarding the American will, pursuant to Maryland Code (1974) Estates & Trusts Article, Section 5–404(a).

The trial judge then ruled that:

[T]he March, 1976 Spanish will is merely a codicil to the December, 1975 will, and the two documents can easily be read together. The codicil merely disposes of the Spanish property to a person other than the individual named in the American will.

\*　　\*　　\*　　\*　　\*　　\*

The effect of reading the two wills together is to leave all of decedent's assets—Spanish and American—to his brother, Albert Lowenthal. The evidence indicates that Albert, who had remained close in family relationship with the Decedent, had received a letter from the Decedent, which is, in this Court's opinion, the single most important exhibit in evidence pertaining to the Decedent's intent. The intent of the letter was clear. The Decedent had revised his American will and had given all of the Spanish assets to Albert. The Decedent did not intend to revoke all prior wills outside of Spain by making the "Spanish

Document," but intended to revise all prior wills outside of Spain and to dispose of the Spanish assets in accordance with his wishes.

Therefore, this Court holds that the "Spanish Document" dated March 3, 1976, and the American Will dated December, 1975 are compatible and can be read together. In accordance with the Decedent's intentions, the American Will should dispose of American assets, and the Spanish Will should dispose of the Spanish assets.

For clarification, we reiterate that the result reached by the trial judge in considering both of the wills together was to pass the decedent's entire estate to his brother, Albert Lowenthal. Under the terms of the American will, read alone, the decedent's American property would go to his brother while his Spanish estate would pass to Rolf Lindner, the son of the decedent's third wife. In neither instance would any of the estate pass to the decedent's children. If, however, the Spanish will were probated alone, the decedent would be considered intestate as to his estate outside of Spain, since the Spanish will purports to revoke all prior wills and omits any and all reference to property other than the property in Spain. Only under these circumstances would the children benefit, by entitlement to a share of the decedent's estate through the laws of intestate succession.

## Contentions

Appellant Lindner asserts that the Spanish document of March 3, 1976, should not have been admitted to judicial probate because it was attested neither in accordance with the law of Spain nor of Maryland. In his view, therefore, the Spanish estate should pass to him under the December 1975 American will.

Appellants Lowenthal have no quarrel with probate of the 1976 Spanish document. They say, however, that the December 1975 American will should not have been admitted to probate because it (and the October 1975 Spanish will) were revoked by the 1976 document. In their opinion, Jean

Lowenthal died partially intestate (as to the American assets) and they, as his surviving children should share in them.[1]

Appellee Rome supports the trial court's actions in probating both the 1975 American Will and the 1976 Spanish document, and in construing the latter as a codicil to the former. Under this interpretation, Albert Lowenthal (or his estate) takes all.

Appellee Rome also argues that the Lowenthal appeal should be dismissed. We shall turn to this contention first.

### Motion to Dismiss

■ As we noted early on, the marriage of Jean and Pilar Lowenthal was annulled in Spain. In an earlier case of *Lowenthal v. Rome,* 294 Md. 277, 449 A.2d 411 (1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1253, 75 L.Ed.2d 481 (1983), the Court of Appeals held that Pilar was not Jean's surviving widow. Thus, she has no interest in the case, and no standing to appeal. She is only a nominal appellant. This, of course, does not deprive her children, Jean, Jr., and Maria Laretta, of standing. But the Lowenthal notice of appeal referred only to Pilar, and not to the children.

Rome's contention is based on the fact that although the children were designated as parties throughout the case by the use of the phrase *"et al."* in all previous pleadings, the phrase, while included in the title of the notice of appeal to this Court, was apparently inadvertently omitted from the body of the order for appeal. We conclude that the case of *Hartz v. Hartz,* 248 Md. 47, 234 A.2d 865 (1967), is dispositive of this contention. In *Hartz,* the appellant had failed to note in the order of appeal that the appellant was appealing in his representative capacity and that the appellee had moved to dismiss the appeal from a finding that an antenup-

---

1. For reasons we shall shortly explain, Pilar Lowenthal is no longer involved in this case. While she is a nominal appellant, the actual Lowenthal appellants are her children.

tial agreement was invalid on the ground above stated. The Court of Appeals, in denying the motion, stated:

> We think that if, as here, the record as a whole makes plain the representative capacity of the party appealing even though he does so without designation, [citations omitted] and the lower court and the other side of the case are adequately advised that a timely appeal is taken, the notice of appeal is effective. [248 Md. at 50 n. 1, 234 A.2d 865].

The record in this case makes it plain that Pilar Lowenthal's children were active parties in the case from the very beginning. At the time the appeal was filed Pilar and the children all had standing to appeal. The fact that Pilar was effectively removed from the case by the refusal of the Supreme Court to grant certiorari on February 28, 1983, did not affect the children's continuing standing as parties to the proceedings. Appellee had more than adequate notice that a timely appeal had been filed and who the parties bringing the appeal were.

The authorities cited by the appellee in support of his motion to dismiss involved cases in which there was no substantive basis for the appeal, *i.e.*, there was no party with standing. *See Webster v. Larmore,* 270 Md. 351, 311 A.2d 405 (1973); *Stuart v. Foutz,* 185 Md. 401, 45 A.2d 98 (1945). In *Attorney General v. Anne Arundel County School Bus Contractors Assn., Inc.,* 286 Md. 324, 407 A.2d 749 (1979), also cited by the appellee, the issue upon which the appeal was based had become moot. The issues in the instant case were not moot as far as the children's interest was concerned.

We conclude that the Lowenthal children are proper parties to the appeal, and deny the motion to dismiss.

*The Testamentary Documents and Their Construction*

1.

■ By this appeal, the appellants challenge the trial court's conclusion that the American will was at issue in the

judicial probate proceedings, since no application for judicial probate of the American will had ever been filed.

In concluding that the American will was properly before him, the trial judge stated:

> The evidence also shows the procedural chronology of this case. A Petition for [administrative] Probate with the original American will and a copy of the Spanish will were filed. A Petition for Judicial Probate [of the Spanish will], Caveat and Other Relief was filed by Pilar Lowenthal, et al. An answer was filed on the Personal Representative to the Judicial Probate Petition, which, among other things asserted the validity for probate of the December 4, 1975 [American] will. The American will was admitted to administrative probate by the Register of Wills Office. Recording errors as to various docket entries took place in the Register of Wills Office in the will's dockets. An Order of the Orphans' Court of Baltimore City was issued denying the Petition for Judicial Probate. An appeal was filed by Pilar Lowenthal, et al. on December 13, 1979.

> Even if this Court found that the American will had not been probated, the answer of the Personal Representative clearly places both wills at issue in the judicial probate proceedings . . . the probate of the [American] will filed by Mr. Rome remained in effect.

Appellants seek the exclusion of the American will from the judicial probate proceeding because no one had sought judicial probate pursuant to Maryland Code (1974) Sections 5–401 through 5–407 of the Estates and Trusts Article. As the trial judge pointed out, "the answer of the personal representative clearly placed both wills at issue in the judicial probate proceedings." All of the parties were aware of the existence of both the Spanish and the American wills and the children filed a copy of the American will with their petition for judicial probate of the Spanish will. They further requested that the American will be found to be in full force and effect and that the Spanish will, if found to be valid, be construed as a revision to the American will.

Additionally, Rolf Lindner, in his answer to the petition for judicial probate, placed both the American will and the Spanish will at issue.

The trial court had the powers, pursuant to Section 5–404(a) of the Estates and Trusts Article, to revoke, modify or confirm any prior administrative or judicial probate action with respect to both the American and Spanish will or either of them once it concluded that both wills were at issue before the court. Appellants' principal complaint is that no formal notice was ever given that the American will was offered for judicial probate. The notice requirements were "designed to give as full notice personally and by publication as can reasonably be accomplished for the protection of all persons having an interest in the proceedings." *See* Comment to former Article 93, Section 5–403. The trial court concluded that under the facts and circumstances of this case, the American will was before it to be considered in concert with the Spanish will in which formal notice of application for judicial probate had been given. There can be no doubt that over the long and drawn out controversy concerning the two wills, all of the parties in interest had actual knowledge of the trial court's intention to consider the wills together.

Judicial probate is a plenary proceeding in which the court "shall adjudicate the issues raised." Estates and Trusts Article, Section 5–404(a). As the Court of Appeals said in *Kerby v. Peters,* 172 Md. 1, 9, 190 A. 511 (1937), "[u]nder any definition of the term, a plenary proceeding implies a complaint, a request for some definite relief, and allegations of fact sufficient to justify the granting of that relief."

In the case at bar, the appellee requested definite relief concerning the American will and issues of fact concerning that will were placed before the court by the petition for judicial probate and the answers thereto as permitted by Section 2–105 of the Estates and Trusts Article. We find no abuse of discretion by the trial judge in considering the American and Spanish wills together.

2.

■ If the Spanish will is valid either as the last will and testament of the decedent or as a codicil to the American will, then the decedent's property in Spain will pass to his brother's estate rather than to appellant Rolf Lindner, as provided in the American will. The trial judge ruled simply that the Spanish document, which was executed in Spain, was validly executed under Section 4–104 of the Estates and Trusts Article. Section 4–104 provides that:

A will executed outside this state is properly executed if it is:

(1) In writing;

(2) Signed by the testator; and

(3) Executed in conformity with the provisions of § 4–102, or the law of the domicile of the testator, or the place where the will is executed.

Appellant Lindner contends that the Spanish will should not have been admitted to judicial probate because it did not comply with the requirements of Section 4–104(3), which requires that the execution of the will conform to the requirement of Section 4–102 or with the law of the country in which the document was executed, *i.e.,* Spain.

Section 4–102 mandates that a will shall be:

(1) in writing, (2) signed by the testator, or by some other person for him, in his presence and by his express direction, and (3) attested and signed by two or more credible witnesses in the presence of the testator.

It is conceded that the Spanish will was "in writing" and signed by the testator but there is a dispute as to whether the will was attested and signed by two or more credible witnesses in the presence of the testator. Section 4–104, however, provides an escape clause from the formal requirements of Section 4–102.

It provides that a will executed outside of Maryland need not comply with Section 4–102 if it is executed in accordance with the law of the place of execution. In this case, that law is found in the Spanish Civil Code adopted in 1973. The

Spanish will is characterized as an "open" will subject to all of the provisions of the Spanish Civil Code.

Article 679 of the Spanish Civil Code defines an open will as one in which the testator expresses his last will in the presence of the persons who must authenticate the act, they being informed of its provisions. Article 681 lists those persons who may not be witnesses to a will. Article 681, Section 4, in conjunction with Article 683, disqualifies any person from acting as a witness who does not understand the language of the testator at the time of the execution of the will. Article 694 requires that an open will shall be executed before a notary qualified to act at the place of its execution and three competent witnesses who see and understand the testator, one of whom at least must know how, and be able to write. As provided in Article 699, all of the formalities mentioned in the Spanish Civil Code must take place in a single act and no interruptions shall be allowed except such as may be caused by some trifling occurrence. The notary is required pursuant to this section to state at the end of the will that all formalities have been complied with and that he is acquainted with the testator or with the witnesses of identification.

Section 687 provides that any will that is not executed with the formalities set forth in the Spanish Civil Code shall be void.

The Spanish will is signed by the notary and three witnesses. The notary is considered to be an attesting witness within the meaning of Section 4–102 of the Estates and Trusts Article. The Spanish will includes a detailed attestation clause which raises a *prima facie* presumption that the will was executed in accordance with the Spanish law. Lindner's sole complaint concerning the Spanish will is that it was not properly attested due to an alleged language barrier. The Court of Appeals, in *Van Meter v. Van Meter,* 183 Md. 614, 39 A.2d 752 (1944), stated the *prima facie* presumption which arises from the inclusion of an attestation clause in a will:

The advantage of an attestation clause is found in its evidential weight in showing that the will was properly executed. The rule is well established that an attestation clause reciting facts necessary for the valid execution of a will is prima facie evidence of the due execution of the will, if it bears the genuine signatures of the testator and subscribing witnesses. [Citations omitted].

At trial in the instant case, testimony was presented from three expert witnesses, one by deposition. Senor Guerrero testified that Spanish notaries are law trained career professionals whose duties include the preparation and solemnization of wills and the maintenance of permanent custody of last wills and testaments. Guerrero, himself a Spanish attorney at the bar in Malaga for some 31 years, was familiar with Senor Palacios, the notary who had drawn the Spanish will. Over a period of 23 years, Guerrero had had approximately 350 wills finalized and solemnized by Senor Palacios, about half of which were on behalf of foreign nationals. Both Senor Guerrero and Senor San Pio, another witness, stated that based on their personal knowledge, Palacios was extremely competent and had an excellent reputation in the community.

There was no testimony presented to establish whether any of the attesting witnesses understood or spoke English, the *native* language of the decedent.

Lindner argues that in the absence of such testimony, proof that the decedent was sufficiently proficient in Spanish to understand the will written in Spanish and to comprehend the significance of the document under Spanish law is necessary, and questions, further, the ability of the decedent and any of the attesting witnesses to communicate with each other in Spanish or any language. Lindner contends that the decedent could neither read nor write in the Spanish language, that decedent's ability to converse in Spanish was minimal, and that under these circumstances the Spanish will was not in compliance with the requirements of

Article 694 of the Spanish Civil Code which requires that attesting witnesses understand the testator.

Lowenthal's Spanish children, to the contrary, testified that the decedent spoke Spanish and was able to read, write and translate the language. As evidence of this they introduced a copy of a legal document which decedent had translated from Spanish to English, and to which document decedent had attached a statement in writing that he had translated it to the best of his ability.

Maryland has held, in *Woodstock College of Baltimore County v. Hankey,* 129 Md. 675, 99 A. 962 (1917), that in determining the validity of a Maryland last will and testament a testator need not go so far as to declare the instrument to be attested as his will if his conduct or the paper itself appraises the witnesses of that fact. Nor is it necessary that he formally ask the witnesses to sign and attest the will. If the witnesses have knowledge of the solemnity of the document and the importance of witnessing the testator's actions, then the requirements of attestation have been met. *See also O'Neal v. Jennings,* 53 Md.App. 604, 455 A.2d 66 (1983).

The attestation clause of the Spanish will declares as follows, translated from the Spanish:

Thus the gentleman states and grants it, appears before me and the instrumental, known witnesses of majority of age, residents of this city and without legal exception to be so, in accordance with the declarations of Frans van Reigersberg Versluys, Francisco Dominguez Alcaide and Miguel Baldaquin Gil.—Said witnesses, whom I know, together with me, see and understand the testator whom they affirm to know.

To all I read this will integrally and aloud—by renouncing his advised right to do it himself, everyone declaring to be advised of its contents and the testator is content with his wish, and therefore approves and signs it together with the witnesses.

As a result of which, by knowing the said witnesses, who identify to me the person of the testator, besides which I am able to prove this by his passport which contains his photograph and signature, of having fulfilled in one sole action and without any interruption all the formalities and legal prescriptions and of the remainder consigned in this public document drawn up on this one only sheet of Class twenty, series D, duly reimbursed, I the Notary certify.— Jean A. Lowenthal.—Frans van Reigersberg Versluys.— Miguel Baldaquin.—Francisco Domingues.—Notarized: JOSE PALACIOS Y RUIZ DE ALMODOVAR, Titled and sealed. IT IS A COPY which I issue for the testator, in the present sheet, class twenty, series D, reimbursed, which I notarize, sign and stamp in Malaga, on the day following its issuance. I certify.

signed:  Jose Palacios y Ruiz de
        Almodovar.
        stamp:  Notary Office of
        D. Jose Palacios Y. Ruiz de
        Almodovar, MALAGA.

Senor Guerrero testified that the Spanish Civil Code required attesting witnesses to understand the language the testator used in the will. He also testified that two of the witnesses to the Spanish will, Senors Palacios and Versluys, spoke Spanish fluently. Versluys was a Dutch lawyer knowledgeable in Spanish law who had practiced in his nephew's law firm in Malaga for some 16 years. Guerrero identified the signatures of Palacios and Versluys; the genuineness of decedent's signature was stipulated by all parties. Testimony indicated that at the time of trial the notary Palacios and the witness Versluys were deceased. The whereabouts of the remaining two witnesses was unknown.

The three witnesses testified as to the proper execution of the Spanish will. All were accepted as experts on Spanish law. Senors San Pio and Guerrero testified in person and Senor Arias by deposition. Senor San Pio testified as follows:

Q. Is there any doubt in your mind that on March 3, 1976, Jean Arthur Lowenthal signed this Will in these terms as set forth in Spanish in these three documents in the presence of Mr. Palacios and the three witnesses, all as one transaction?

A. In my mind, there is no doubt that he signed it.

Q. Now, that he signed, as I stated, in the presence of the notary and the witnesses?

A. That's correct. When he signed the witnesses and the notary, they were present and they witnessed his signature.

Senor Guerrero, in interpreting Article 681, Section 4, which we have heretofore mentioned, stated that the "language of the testator" meant the language in which the will was written. Senor San Pio agreed that this was the correct meaning of that portion of the Spanish Civil Code.

The trial judge, in his memorandum opinion and order, made no factual finding concerning the dispute over the decedent's ability to comprehend written and/or spoken Spanish. He merely stated that the Spanish document dated March 3, 1976, was validly executed under Section 4–104 of the Estates and Trusts Article. There was ample testimony by witnesses for both sides from which the trial court could and implicitly did conclude that the decedent and the attesting witnesses were sufficiently proficient in Spanish to understand the document they were executing and that the will was executed in accordance with Spanish law and was therefore acceptable in Maryland under Section 4–104 of the Estates and Trusts Article.

### 3.

In order for the children of Pilar Lowenthal to be the beneficiaries of a portion of the decedent's estate it would be necessary for this Court to determine that the Spanish will was the sole valid last will and testament executed by the decedent. We would also be required to conclude that the execution of the Spanish will revoked all previous wills including the American will, so that the decedent died

intestate as to all of his estate except for that portion of his assets located in Spain. The effect of such a determination would be that the decedent's property in Spain would pass to the estate of his deceased brother in Maryland and decedent's property in Maryland would pass by intestacy to his children in Spain. Approximately two-thirds of the decedent's assets are located in Maryland, the remaining one-third in Spain. The American will, in separate dispository provisions, granted disposition of all of the decedent's estate, including the assets in America and in Spain. The later Spanish document disposed of only the Spanish assets and made no mention of the American portion of his estate.

The controversy over this issue arises because the decedent executed his American will in Maryland on December 4, 1975 and, having returned to Spain, executed another will in Spanish, in compliance with Spanish Law, on March 3, 1976. The Spanish will contained a clause which stated, "[H]e revokes by the present his previous wills." Testimony of the three experts in Spanish law was presented to the trial court on this issue, two of the witnesses testifying in person, and the third by deposition.

As so frequently happens, the experts disagreed as to whether the Spanish will was intended as a condicil to the American will, or a complete will by itself and whether the revocation clause was intended to revoke *all* prior wills or only any prior Spanish wills. There was a marked difference of opinion in the testimony of the two Spanish attorneys who testified as to the meaning of the revocation clause. Senor San Pio testified that the revocation clause would not revoke provisions in wills executed outside of Spain disposing of non-Spanish assets. Testifying on behalf of the appellee, Senor San Pio, in interpreting the applicable Spanish law, said that although the revocation clause in the Spanish will of March 3, 1976, was clear standing alone, the entire will raised in his mind "some doubts." Senor San Pio stated that under Spanish will construction law "... the intention prevails over the wording of the will," that parol evidence is admissible, and that under Spanish law if a

testator makes a partial will and does not dispose of the rest and residue of his estate, the presumption against intestacy nevertheless still comes into play. Senor San Pio concluded that it was not possible that the testator intended by his Spanish will to revoke all prior wills because "that is not my opinion nor the people I have talked to since 1978 until today."

Senor Guerrero, who appeared as a witness for the children,[2] testified that the March 3, 1976, Spanish document revoked all prior wills, regardless of which assets were disposed of and where the will was executed and that the language of revocation used was commonly used by draftsmen of wills in Malaga in 1976. Senor Guerrero, in testimony concerning the translation of the revocation clause, said:

Q. What is the effect of the third clause on Wills of the testator dated prior to March 3, 1976?

A. It revokes, it leaves without any effect or value any previous Wills.

Q. Would that revocation apply to Wills, prior Wills wherever they were made?

\* \* \* \* \* \*

THE WITNESS: The way I understand it, it's all the previous Wills. It doesn't matter where or when. This means to revoke, that means all the Wills.

Senor San Pio, who appeared as a witness for Morton Rome, in direct testimony concerning the effect of the revocation clause, stated:

Question by Mr. Winter: Assuming that John [sic] A. Lowenthal owned assets in Spain and assets in the United States, based upon your review of the March 3, 1976, docket and upon Spanish law, do you have an interpretation or an opinion as to the meaning of the Revocation Clause in Clause No. 3 of the March 3, 1976, docket? Answer: Yes, sir.

---

**2.** Senor Guerrero had been the attorney for Pilar Lowenthal in proceedings in Spain involving the deceased, Jean Arthur Lowenthal.

Question: And what is that opinion?

Answer: The Revocation Clause which is Clause No. 3 revokes prior wills in Spain and insofar as Spanish assets is [sic] concerned. If, in addition, it also revoked the American will of December 4, 1975, insofar as Spanish assets is [sic] concerned, and none of the two wills or documents, the American Will of December 4, 1975, nor the Spanish Will of October 20, 1975, were revoked totally—it will have only revoked partially and insofar as the Spanish assets is [sic] concerned.

\* \* \* \* \* \*

Question by Mr. Winter: What is your opinion of Clause 3 of the Spanish Will of March 3, 1976?

Answer: That Clause No. 3, in my opinion, is correct provided two things concur:

1. Is that it revokes only prior wills executed in Spain, and

2. that it only revokes prior wills insofar as Spanish assets is concerned.

Question: Would your answer be different if the Spanish Will disposed of assets outside of Spain?

Answer: No different—I would consider Clause 3 a correct one if the 1976 will would have disposed of the assets both in Spain and outside of Spain; however, that clause would have been different.

Question: If the Revocation Clause in Clause 3 of the will was to revoke wills disposing of assets outside of Spain, how would that revocation read?

Answer: All right. Although I understood already your question before, I'm going to give you a language that I will have used and notaries in Spain will have used in my judgment. In addition to the language that exists in Clause 3—My answer is in addition to the language currently existing under Clause 3, I will have added these words, "including my prior wills executed outside Spain and disposing of assets located also outside of Spain." This is my language.

■ The trial court had before it the conflicting testimony of the two experts in Spanish law. In reaching his conclusion, the trial judge accepted the opinion of Senor San Pio on the basis of the holding of the Court of Appeals in *Lindsay v. Wilson*, 103 Md. 252, 63 A. 566 (1906), where the Court ruled that in construing a will the Maryland courts should accept the meaning of a word or expression that is its accepted meaning in the country where the language is used and where the will was made. As the Court of Appeals noted, in *Judick v. Travers*, 184 Md. 215, 225, 40 A.2d 306 (1944), the words chosen to express the testator's intention "will ordinarily be given their accustomed technical meaning." In this case, however, the trial court was required to determine initially whether the words used were to be considered as a term of art and whether the technical meaning to be given to them should be the meaning in Spain or in the United States. The Court of Appeals, in *Lindsay v. Wilson, supra,* in discussing the responsibility of the trial court to accomplish its principal object of the law applicable to wills, *i.e.,* to carry out the intention of the testator, said:

Would it not be therefore remarkable if when called upon to construe a will written in a foreign language a Maryland Court must refuse to accept the meaning of a word, or expression used in a will that is its accepted meaning in the country where that language is used, and where the will is written? [103 Md. at 274, 63 A. 566].

\*    \*    \*    \*    \*    \*

If a person goes to a lawyer or notary in France to have a will drawn and tells him he desires to leave all his property to his wife, and the lawyer or notary uses terms that in the French language mean precisely what the testator intends, although perhaps in this country they would or might have a more limited meaning, is it to be said that we must adopt the latter, although the evidence in the case shows what it does mean in France? ... But the question before us is ... "what did the testator mean by such expressions ..." and the only possible way to determine it is to have capable persons familiar with the

French language translate them, unless the Court is sufficiently versed in French to understand their meaning in the connection in which they are used. When that is done, the will must then be "governed by and construed and interpreted according to law of Maryland"—in a word, after the will, if written in a foreign language, is properly translated and the meaning of words and terms herein used ascertained, the law of this state and that of the testator's domicile is . . . to control the Court in construing and interpreting it. [*Id.,* at 275, 63 A. 566].

In support of its conclusion, the trial court cited *Rabe v. McAllister,* 177 Md. 97, 8 A.2d 922 (1939), where the Court of Appeals had before it the issue of which of three wills, if any, should be probated, one of which had been executed in Maryland in accordance with Maryland law, and two of which were subsequent holographic wills executed in Germany. The first American will disposed of all assets; the second German will named a sole heir. The third will revoked a previous will and made only a partial disposition of the testator's property. The Court, in *Rabe v. McAllister, supra,* at 104, 8 A.2d 922, indicated very carefully and clearly the function of the trial court in determining the probate of wills:

Not only does the validity of a proffered will depend upon its form and execution, but it must be in existence as a testamentary instrument as of the death of the testator. To be thus effectively in existence, the will need not be an exclusive nor complete disposition of the estate, and may be read in connection with other testamentary documents which are entitled to probate.

In *Rabe v. McAllister,* the Court specifically found that the first American will and the last German will could be read together, and both could be admitted to probate, thereby avoiding an intestacy.

In the conclusion of his memorandum in the case at bar, the trial judge stated:

Both Maryland law, based on Estates and Trusts Article § 4–402, and Spanish law, based on Mr. San Pio's testimony, recognize a presumption against intestacy. The evidence in this case shows that approximately two-thirds of Jean Arthur Lowenthal's assets are in America and one-third of his assets are in Spain. The American Will disposed of all the Decedent's assets, while the Spanish Will, executed three months later, disposed of only the Spanish assets. Therefore, if the "Spanish Document" revoked all prior wills, two-thirds of the Decedent's estate would pass to his heirs by intestate succession.

The presumption against intestacy implies that the "Spanish Document" should not revoke all prior wills; nonetheless, wills should be construed to effect the intent of the testator. *McElroy v. Mercantile Safe-Deposit and Trust Company,* 229 Md. 276, 182 A.2d 775 (1962).

The effect of reading the two wills together is to leave all of the Decedent's assets—Spanish and American—to his brother, Albert Lowenthal.

■ It was the trial court's responsibility to determine the intention of the testator, and in ascertainment of that intention the language or words of the will are to be read in the light of the circumstances under which the will was written. *Jones v. Holloway,* 183 Md. 40, 36 A.2d 551 (1944). Although testimony is not admissible to show intent, testimony is admissible to show the meaning of the words used by the testator. *Warner v. Miltenberger, Lessee,* 21 Md. 264, 83 Am.Dec. 573 (1864).

■ If, as argued by the appellant, the meaning of the word "revoca" as used in the Spanish will is read literally, an intestacy as to two-thirds of the total assets of the decedent's estate would result. On the basis of the facts before the trial judge it is clear that this was not the intention of the decedent. The judge concluded that the purpose of the Spanish will was to create a specific devise of the Spanish property and not to disturb the residuary provisions of the American will which had been executed only three months

before. The presumption against intestacy is particularly strong where the disposition involves the disposition of the residue of an estate. *See Payne v. Payne,* 136 Md. 551, 555, 111 A. 81 (1920), where the Court of Appeals said, " . . . every intendment is to be made against holding a man to be intestate who sits down to dispose of the rest and residue of his property." Accepting Senor San Pio's interpretation, the Spanish will had a residuary clause as to the Spanish assets of the decedent, and the American will also had a residuary clause which disposed of the American assets. On the basis of the evidence before the trial judge, we conclude that there was sufficient evidence to support his ruling as to the intention of the testator and that there was no error of law in that finding.

4.

In his memorandum opinion, the trial judge noted that soon after the execution of the March, 1976 Spanish will, the decedent wrote to his brother Albert and enclosed a copy of this will. That letter stated: "Dear Albert: The enclosed is a revision of my will as pertains to all my property in Spain which accordingly goes to you. Love to you and Alison, [signed], Jim.

The trial judge, in considering that letter, said in his memorandum opinion:

The evidence indicates that Albert, who had remained close in family relationship with the Decedent, has received a letter from the Decedent, which is, in this court's opinion, the single most important exhibit in evidence pertaining to the Decedent's intent. The intent of the letter was clear. The Decedent had revised his American will and had given all of the Spanish assets to Albert. The Decedent did not intend to revoke all prior wills outside of Spain by making the "Spanish Document", but intended to revise all prior wills outside of Spain and to dispose of the Spanish assets in accordance with his wishes.

Appellants argue that the letter was inadmissible because there was no ambiguity which justified the admission of the letter to establish the intention of the testator. Appellants overlook the teaching of *Rabe v. McAllister, supra,* at 104, 8 A.2d 922 which indicates that in a probate proceeding (and there is no question that this litigation involves both probate and caveat) "... the terms of the instruments involved with the pertinent accompanying facts and circumstances, may be considered, but solely with reference to the issue of the existence as a testamentary paper of the questioned document. If this inquiry should lead to the incidental construction of the paper writing, the construction would be permitted, while restricted to its bearing on the *issue of the subsistence or revocation of the testamentary instrument.*" [Emphasis supplied]. [Citation omitted].

The record indicates that at a deposition of Albert Lowenthal, counsel for the appellant Spanish children first raised the question concerning the March 11, 1976 letter. It was their counsel who questioned when the letter was mailed, when it was received, and what its contents were. That information was included in the deposition which became admissible under Maryland Rule 413 a 3(1) when Albert Lowenthal deceased. Under these circumstances, considered in the light of Maryland Rule 1086 which requires us to consider the evidence in the light most favorable to the appellee, we cannot find that the trial judge was clearly erroneous. Even if the court did commit error in the admission of some portion of the evidence in this case, that evidence was not dispositive of the issues. All errors are not reversible, as some are deemed under the totality of the circumstances of the particular case, to be harmless. *See Hopkins v. State,* 24 Md.App. 53, 69, 329 A.2d 738 (1974).

We shall affirm the order of the circuit court dated October 22, 1982, and order the judicial probate of both the American December 4, 1975, will and the March 3, 1976, will.

MOTION TO DISMISS APPEAL DENIED. ORDER AF-
FIRMED; COSTS TO BE PAID BY APPELLANTS, OTH-
ER THAN PILAR LOWENTHAL.