34

JOPPA SAND AND GRAVEL CORPORATION et al.
*v.* L. EPSTEIN AND SONS, INC.

[No. 496, September Term, 1977.]

*Decided March 8, 1978.*

The cause was argued before Thompson, Moore and
Couch, JJ.

*C. William Clark,* with whom was *Joseph K. Pokorny* on the
brief, for appellants.

*William H. Holden, Jr.,* with whom were *John J. Ghingher, Jr.,* and *Weinberg & Green* on the brief, for appellee.

MOORE, J., delivered the opinion of the Court.

Appellant, Joppa Sand and Gravel Corporation (Joppa),[1] was engaged in excavating sand and gravel from a 145-acre parcel located in Joppatowne, Harford County, adjacent to land upon which appellee, L. Epstein and Sons, Inc. (Epstein), operated the Towne Plaza Shopping Center, and to additional unimproved land owned by Epstein, intended for the expansion of the shopping center.

The 145 acres were owned by Fidelity Mutual Life Insurance Company and Epstein had "first refusal" rights with respect to their purchase. Joppa made an offer to purchase the entire acreage from Fidelity for $250,000. Epstein thereafter agreed with Joppa, by letter dated June 6, 1973, to surrender its rights of first refusal in consideration of (1) a commitment by Joppa that for a period of 50 years the 145 acres would not be devoted to a use "competitive with any use" on the land of the shopping center, and (2) a commitment by Joppa to make available to Epstein 70,000 cubic yards of fill dirt within two years.[2]

The legal action giving rise to this appeal was a suit by Epstein against Joppa in the Circuit Court for Baltimore County for specific performance of the agreement to make the fill dirt available. The chancellor (Haile, J.) granted the relief prayed. We now reverse.

I

We glean from the record [3] in this case that the parties originally discussed the payment by Joppa to Epstein of a sum

---

1. Appellees contend, as noted *infra,* that this appeal has not been perfected by Joppa but only by one of the individual defendants (officers of Joppa and their wives). We find this contention without merit.

2. As stated *infra,* two parcels of land owned by Epstein, and contemplated to be used for the shopping center expansion, were 8 to 10 feet lower than the level of the center and needed substantial fill. One of these parcels, consisting of more than 8 acres, required rezoning from A-1 to B-2 classification.

3. The parties have followed the provisions of Maryland Rule 1028 (g) entitled "Agreed Statement of Facts." Appellant's brief under the heading

of cash in addition to the restrictive use covenant above described. It appears, however, that Epstein was more interested in obtaining fill dirt from the adjacent tract because two parcels owned by it and upon which the shopping center could expand were some 8 to 10 feet below the level of the shopping center and required substantial fill. One such parcel also required rezoning. Accordingly, the first agreement drafted by counsel for Epstein, dated June 1, 1973, provided, in addition to the restrictive use covenant, that Joppa agreed to "deliver and to place wherever . . . may be designated by L. Epstein and Sons, Inc., [on its land] seventy thousand (70,000) cubic yards of clean, compactible fill dirt within two (2) years . . . "; and in the event of default by Joppa, it would pay Epstein the sum of one dollar per cubic yard or the market price of purchasing such fill, whichever was greater, for any deficiency at the expiration of the two-year period.

The executive personnel of Joppa demurred to this proposition because the cost of delivery of the fill, which then had a market value of one dollar per cubic yard, was approximately equal to the cost of the fill itself; and there would thus result a substantial surcharge upon the $250,000 purchase price offered by Joppa to Fidelity Mutual. The ensuing negotiations between the parties led to the agreement of June 6, 1973 upon which this litigation is based. The restrictive covenant with respect to the use of the 145 acres was retained in this agreement and is not here in dispute. That part of the agreement which *is* in controversy is paragraph two, which consists of three sentences. The first imposed a duty upon Joppa to make the fill dirt available, and

---

"Statement of Facts" sets forth a summary of the direct and cross-examination of the witnesses for the respective parties. Appellee's brief under the heading "Statement of Facts," states: "The Appellee concurs with the Statement of Facts in Appellant's brief." Rule 1028 (g) authorizes the parties by stipulation to summarize the testimony of witnesses and the contents of exhibits and to include such stipulation in the printed extract in lieu of the testimony or exhibits. It also authorizes but does not require the parties, by agreement, "to state all or part of the testimony in narrative form." Such a narrative would have been desirable in the instant case. In its absence, we have found it necessary to read the full transcript of the proceedings below in order to place the testimony in proper focus.

upon both parties a duty to cooperate in the fill operations. The language employed is as follows:

"Joppa Sand and Gravel Corporation agrees to make available to L. Epstein and Sons, Inc., seventy thousand (70,000) cubic yards of clean, compactible fill dirt *within two (2) years after the date hereof,* and the parties will cooperate in the timing and conduct of said fill operations." (Emphasis added.)

The second sentence protected Epstein, in the event of a default by Joppa, by a liquidated damage clause. To quote this provision:

"In the event of any default by Joppa Sand and Gravel Corporation in the performance of this undertaking, it will pay to L. Epstein and Sons, Inc., the sum of One Dollar ($1.00) per cubic yard or the market price of purchasing such fill, whichever shall be greater, for any deficiency in fill delivered as aforesaid *at the expiration of said two (2) year period.*" (Emphasis added.)

Finally, the third sentence of paragraph two contained what Joppa in its brief characterizes as a "Conversion Clause":

"If, at any time *prior to June 1, 1975,* you elect to convert into dollars your right to receive 70,000 cubic yards of dirt as aforesaid, and so notify us in writing, we agree that for each cubic yard less than 70,000 so removed by you we shall pay you the sum of One Dollar ($1.00) on *October 1, 1975.*" (Emphasis added.)

According to the uncontradicted testimony of the officers of Joppa, between 40,000 and 50,000 cubic yards of dirt were available on the 145-acre site at the time of the execution of the agreement between the parties; the period of time necessary to move the entire quantity of 70,000 cubic yards was estimated as being between 45 and 60 working days.[4]

---

4. The difference between the quantity on hand at date of execution of the agreement and the 70,000 cubic yards required was to be made available during the continuing excavation operations of Joppa.

None of the fill dirt was ever picked up by Epstein, which, it appears, was preoccupied with the conduct of its business operations at the shopping center and the aforementioned application for rezoning. (The rezoning application consumed two years but reclassification was finally granted in July 1976.) Furthermore, Epstein contended that Joppa failed to construct a road, as had been previously agreed, on the adjacent 145-acre tract over which the dirt was to be transported to Epstein's land where the fill was to be used, without the necessity of traversing a lengthier county road.[5] In this connection, the only allegations of Epstein's bill of complaint to which a denial was interposed by Joppa related to the interior road and an alleged oral agreement to extend the time for making the fill dirt available until the completion of the road by Joppa. The fifth paragraph of the complaint stated:

> "Due to the fact that said fill was not immediately needed by Plaintiff, and because the interior private road over which said fill was to be conveyed to Plaintiff's land had not been completed by the Defendants *within said two year period,* in May of 1975 the parties orally agreed that said fill would be made available by the Defendants to the Plaintiff upon completion of said road by Defendants on a date subsequent to June 6, 1975." (Emphasis added.)

After hearing the evidence, the chancellor found no commitment by Joppa to build the aforesaid interior road and, by implication, no oral agreement that the fill would be made available by Joppa upon completion of the road. He made the following finding of fact in this respect:

> "I also do not find enough from the evidence, I don't find by a preponderance of the evidence, this is a factual finding, that Joppa Sand and Gravel gave any more than advice on the preparation of the road. I don't think they committed themselves to spend any money on it because of the testimony that the

---

5. According to Epstein's comptroller, Harry Jacobs, the cost to Epstein of hauling the dirt would be reduced by the construction of the interior road.

road building would be part of the operation of removing the fill dirt."

In December 1975, some six months after the expiration of the two-year period specified in part one of the agreement, Epstein's comptroller, Harry Jacobs, telephoned Vincent C. Kadyszewski (also known as Kadell), vice-president and treasurer of Joppa, to state that Epstein was ready for the fill dirt. Mr. Kadell refused to provide the dirt, stating: "[This] is six months after the expiration date of the contract." The bill of complaint was filed by Epstein on March 15, 1976.

In an oral opinion at the conclusion of the testimony and oral argument, the court found that while there was an obligation on the part of Joppa to make the dirt available within two years, Epstein did not have to remove it within that period but could do so "at its leisure." [6] In the formal decree subsequently filed, the court ordered that Epstein "shall have a period of six (6) months from the date of enrollment of this decree to remove the 70,000 cubic yards . . . ," with a provision for extension of time in the event of an appeal.

## II

In our view the chancellor misinterpreted the agreement between the parties and failed, in this specific performance action,[7] to accord due consideration to the facts and

6. As a further factual finding, the chancellor held that there was no default on the part of Joppa because the full 70,000 cubic yards were not available "by the deadline." He pointed out that the full amount was not available "not through any fault of [Joppa's] but because [Epstein] had not started moving the dirt yet."

7. The right to specific performance of an agreement to make fill dirt available was not challenged by Joppa in the proceedings below on the ground that Epstein had an adequate remedy at law. Neither has this issue been argued or briefed on this appeal. We consider it doubtful that the agreement was amenable to a suit for specific performance especially where the parties covenanted not only with respect to liquidated damages in the event of a default by Joppa but also granted Epstein an option any time prior to June 1, 1975 to convert into dollars its right to receive 70,000 cubic yards of dirt at $1.00 per cubic yard. *Compare* Rogers v. Dorrance, 140 Md. 419, 117 A. 564 (1922) (vendor not precluded from obtaining specific performance where liquidated damage clause was for his exclusive benefit in event of purchaser's breach); Armstrong v. Stiffler, 189 Md. 630, 56 A. 2d 808 (1948) (specific performance should be denied only where liquidated damage clause was intended to create an option to perform or to pay damages). *See generally* 81 C.J.S. Specific Performance § 60 (intent of parties determines whether liquidated damage clause eliminates entitlement to specific performance).

circumstances existent at the time of execution of the agreement and the subsequent conduct of the parties — particularly that of Epstein, the complainant in this action.

When the agreement was signed on June 6, 1973, as much as seventy per cent of the full 70,000 cubic yards was on hand, "available" to be loaded and trucked by Epstein. There is no indication whatever in the record that Epstein was oblivious of this fact; nor do we find any necessity for a showing of formal notification by Joppa even assuming the applicability of the provisions of the Uniform Commercial Code,[8] upon which appellee relies, in the light of the mutual covenant in the first sentence of paragraph two that "the parties will cooperate in the timing and conduct of said fill operations." This clause, we believe, was sufficient to constitute a variance of any duty under the Commercial Code for the seller to give notice of availability of the goods. Md. Com. Law Code Ann. § 1-102 (3) (1975).

Notwithstanding the immediate availability of so large a percentage of the dirt, Epstein did not lift a finger towards its removal, and 2 ½ years elapsed between the date of the agreement and December 1975 when Epstein's comptroller, in a telephone call to the vice-president of Joppa, finally signified Epstein's readiness to proceed. The chancellor saw no impediment to this belated communication. The agreement, it was held, was silent as to when Epstein was to remove the fill dirt and the chancellor considered Epstein to be under no time constraints whatsoever.

We disagree. Admittedly, the parties did not *expressly* make time of the essence and, in equity, time is not generally deemed as being of the essence of the contract. 3A *Corbin on Contracts* § 713 (1960); 6 *Williston on Contracts* § 852 (3d ed. 1962); *Kasten Construction Co. v. Maple Ridge Construction Co.,* 245 Md. 373, 226 A. 2d 341 (1967). Nevertheless, if it

---

8. *See* Md. Com. Law Code Ann. § 2-107 (1) (1975) which provides that a contract for the sale of "timber, minerals or the like" is a contract for the sale of goods if they are to be severed by the seller; and § 2-503 (1) which requires that a seller of goods is required to give the buyer any notification reasonably necessary to enable the buyer to take delivery. The latter section provides that "[t]he manner, time and place for tender are determined by the agreement and this title . . . ."

necessarily follows from the intent of the parties, based on the nature and circumstances of the agreement, that time *should* be regarded as of the essence, *String v. Steven Development Corp.,* 269 Md. 569, 307 A. 2d 713 (1973), *Scarlett v. Stein,* 40 Md. 512 (1874), courts of equity will not lend their aid to enforce specifically such an agreement without due regard being given to the limitation of time. Miller, *Equity Procedure* § 663; *Doering v. Fields,* 187 Md. 484, 50 A. 2d 553 (1947).

Here, the language of the second paragraph of the agreement clearly indicated an intention of the parties that their business relationship with respect to the fill dirt would be terminated within a period of two years.[9] This is shown by the first sentence of paragraph two, above quoted, where it was written that Joppa would make available the dirt in question "within two (2) years after the date hereof"; it is also shown by the second sentence, the liquidated damage clause, relating to "any deficiency in fill delivered as aforesaid at the expiration of said two (2) year period"; and it is again demonstrated in the third sentence which conferred upon Epstein the option to convert from dirt to dollars, it being provided that the option had to be exercised prior to June 1, 1975 — almost two full years later — only the payment by Joppa being deferred until October 1, 1975.

Epstein argues that, even if time was of the essence of the contract, the two-year provision was not an irrevocable limitation on its performance; a "reasonable time" was thereafter available for its removal of the dirt, or, similarly, for Joppa to make the full 70,000 cubic yards available. This proposition, we feel, is inapplicable to the facts now before us, where Epstein took no action whatsoever prior to the expiration of the two-year period. In the case of *Doering v. Fields, supra,* involving a real estate sales contract, Chief Judge Marbury noted that the provision "within 45 days from

---

9. The provisions of paragraph one with respect to the restrictive covenants as to non-competing use were, under the provisions of paragraph three of the agreement, to be implemented at or immediately following the recordation of any deed from Fidelity Mutual to Joppa.

date of contract" did not make time of the essence, but went on to say in language appropriate here:

> "It is true that [the parties] are presumed to know that such a period in a contract affecting real estate is relative and is not to be interpreted absolutely literally. *It is just as true that it means something. It is not to be totally disregarded.* It is an approximation of what the parties regard as a reasonable time under the circumstances of the sale." 187 Md. at 490. (Emphasis added.)

In the instant case, Epstein not only refrained from any action toward removal of the dirt, but procrastinated for a period of 2 ½ years before indicating even its readiness to proceed; such a delay was in total disregard of the provisions of the contract with respect to time, and constituted an abnegation of its responsibility as a seeker of specific performance, whether or not time was of the essence, to show that it was "ready and desirous, prompt and eager" to obtain performance. Miller, *Equity Procedure, supra,* § 661; *Boyd v. Mercantile-Safe Deposit and Trust Co.,* 28 Md. App. 18, 344 A. 2d 148 (1975); *Silver Holding Corp. v. Sheeler,* 231 Md. 35, 188 A. 2d 562 (1963); *Doering v. Fields, supra.* The principal defense for such an action alleged by Epstein in its bill of complaint and covered by the testimony of its witnesses was the allegation previously discussed that Joppa had further undertaken to build an interior road between the respective properties over which the dirt could be less expensively hauled, and that there had been an oral agreement extending the time. The chancellor, as fact finder, flatly rejected this contention, and the inevitable consequence of his finding is that Epstein stands defenseless for the untoward delay in its performance of the mutual covenants of the agreement.[10]

---

10. We find no merit in Epstein's argument that a forfeiture of its rights would result if specific performance is denied. Admittedly, Epstein had performed its primary obligation under the agreement to forbear from exercising its right of first refusal to purchase the 145-acre tract. Partial consideration for such forbearance was received in the form of Joppa's acceptance of a restrictive covenant with respect to the use of the land, which extended over a fifty-year period. Epstein's obligation to remove the fill dirt within the time constraints of paragraph two of the agreement conditioned its entitlement to the remaining consideration.

## III

Epstein contends that this appeal was not perfected by any of the defendants (appellants) except Andrew G. Wargo, the president of Joppa Sand and Gravel Corporation.[11] This claim is based upon the notice of appeal which read as follows:

"MR. CLERK:

Please enter an appeal to the Court of Special Appeals of Maryland from the Decree For Specific Performance of Contract entered in the above matter and Order signed by The Honorable Walter R. Haile on April 20, 1977, adverse to the Defendant, ANDREW G. WARGO.

JOSEPH K. POKORNY
Attorney for Defendants."

We find no merit in Epstein's argument. In our judgment, the phrase "adverse to the defendant, Andrew G. Wargo" was surplusage, and may not be construed to limit the notice of appeal to him alone. The appeal was clearly noted with respect to the decree for specific performance which was applicable to all five appellants — the corporation and the four individuals — and was signed by counsel in his capacity as attorney for all of them. *See Christy v. Hammond,* 161 Md. 139, 144, 155 A. 322 (1931).

*Judgment reversed; appellee to pay the costs.*

---

11. The action below was brought against the corporation, its president and secretary and the spouse of each. The decree of the court awarded specific performance against all of them.