550 A.2d 959

**George C. NEWMAN, II, et al.**

v.

**Luke R. REILLY.**

**No. 24, Sept. Term, 1988.**

Court of Appeals of Maryland.

Dec. 12, 1988.
Motion for Reconsideration Denied Feb. 3, 1989.

Conrad W. Varner, Mark D. Thomas and Strite, Schildt, and Varner, all on brief, Hagerstown, for petitioners and cross-respondents.

Cynthia E. Young, Annapolis, Daniel M. Zerivitz, Baltimore, both on brief, for respondent and cross-petitioner.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

RODOWSKY, Judge.

The plaintiff in this tort action was involuntarily committed to a mental disorder treatment facility on the certificate of two physicians and was released following the first admission hearing at the facility. Plaintiff alleged, *inter alia*, that the defendant, one of the certifying physicians, had not followed statutorily mandated procedures for an involuntary commitment. The merits of that contention turned on a relatively narrow question of statutory construction which was obscured, if not buried, by the layers of legal papers filed in proceedings in health claims arbitration and in circuit court. There emerge for this certiorari review three issues concerning costs of defense incurred both in arbitration and in the circuit court and imposed as sanctions by the circuit court on both the plaintiff and his trial counsel. Those issues are:

1. Was the circuit court authorized to sanction conduct which occurred in health claims arbitration?

2. Did the continued prosecution of this claim in the circuit court justify assessing the cost of defense in the circuit court as a sanction?

3. In any event, are the appellate courts prevented from reviewing the sanction imposed on trial counsel because the order for appeal filed in the circuit court in this case is ineffective as to trial counsel?

We shall answer each question "No," for reasons hereinafter stated.

The challenged commitment extended from August 7 to August 11, 1983.[1] Plaintiff, Luke R. Reilly (Reilly), was

---

1. In a health claims arbitration case the circuit court record does not contain the record in the arbitration proceedings, much less any discovery undertaken but not filed in the arbitration record. Our statement of the facts out of which the plaintiff's claim arises relies

employed by the Maryland State Police, apparently as a police officer. He and his wife had been separated. Prior to the involuntary commitment Reilly had manifested symptoms of depression and at times had spoken and acted in a manner at least suggestive of suicide.

On August 7, 1983, at about 8:30 a.m., Reilly telephoned the offices of the professional association of which the defendant, Dr. George C. Newman, II (Dr. Newman), was a member.[2] Reilly left a message on the answering machine that he desired to speak to a Dr. Wooster, who was also a member of the professional association. Because Dr. Wooster was not working that day, Dr. Newman returned Reilly's call at approximately 9:00 a.m. Reilly stated that he preferred to speak with Dr. Wooster and did not discuss with Dr. Newman whatever had prompted Reilly's call to the doctors' offices. Dr. Newman replied that he would try to reach Dr. Wooster for Reilly.

Dr. Newman placed a telephone call to Reilly at about 1:00 p.m. that same day, advising him that he had been unable to reach Dr. Wooster but that he had spoken to Reilly's estranged wife and that he understood Reilly's problem. Approximately twenty minutes before placing the telephone call to Reilly, Dr. Newman had telephoned the Hagerstown barracks of the Maryland State Police and arranged for the State Police to bring Reilly to Washington County Hospital.

At approximately 2:00 p.m. Dr. Newman "contacted" Dr. Ira L. Fetterhoff, a psychiatrist who had examined Reilly

heavily on the facts presented in the defendant's successful motion for summary judgment in health claims arbitration. That motion, which was filed as an exhibit to the defense motion for sanctions filed in the circuit court, included among the facts most favorable to the plaintiff certain of the allegations in the plaintiff's complaint in arbitration.

**2.** The professional association was also joined as a defendant based on respondeat superior. For simplicity's sake we shall treat the case as if Dr. Newman were the only defendant.

for three hours on August 6, 1983.[3] Dr. Newman arranged for Dr. Fetterhoff to be at Washington County Hospital when the State Police arrived with Reilly.

A third telephone conversation between Dr. Newman and Reilly occurred at about 3:00 p.m., just before the State Police "escorted" Reilly to Washington County Hospital. Neither party's version of that conversation is in the record.

When the police arrived at the hospital, Reilly remained on the parking lot. From inside the building Dr. Newman was able to see him through a window. This was the closest contact Dr. Newman had with Reilly at the hospital. Dr. Fetterhoff went out to the parking lot and spoke with Reilly, saying: " 'You are going to Taylor Manor just for an evaluation. It's only a five-day evaluation. After five days, if everything is okay, you will be released and that will be the end of it.' "

The police took Reilly to Taylor Manor. The admission note is not in the record. According to defendant's characterization, it "indicate[d] that [Reilly's] behavior was threatening to himself and others."

The procedure Dr. Newman undertook to follow for Reilly's involuntary commitment was that prescribed in Md. Code (1982), §§ 10–613 through 10–617 of the Health–General Article (H–G). These sections comprise part III, "Involuntary Admissions," of subtitle 6, "Admission Provisions," of Title 10, "Mental Hygiene Law." In Title 10, " '[f]acility' means any public or private clinic, hospital, or other institution that provides ... treatment ... for individuals who have mental disorders." H–G § 10–101(e)(1). One of the statutory requirements for an application for involuntary admission to a "facility" is that it be accompanied by certain certificates of either one physician and one psychologist, or of two physicians.[4] Drs. Newman and

---

**3.** There is no indication in the record before us that Dr. Fetterhoff, based on his examination, sought to have Reilly committed involuntarily.

**4.** H–G § 10–615 provides in its entirety as follows:

Fetterhoff signed the certificates for Reilly's involuntary admission. H–G § 10–616(a)(1)(i) requires that an involuntary admission certificate "[b]e based on the *personal examination* of the physician or psychologist who signs the certificate[.]" (Emphasis added).[5]

---

"Each application for involuntary admission to a facility or Veterans' Administration hospital under Part III of this subtitle shall:
(1) Be in writing;
(2) Be dated;
(3) Be on the form required by:
(i) The Administration, in the case of a facility; or
(ii) The Veterans' Administration hospital, in the case of a Veterans' Administration hospital;
(4) State the relationship of the applicant to the individual for whom admission is sought;
(5) Be signed by the applicant;
(6) Be accompanied by the certificates of:
(i) 1 physician and 1 psychologist; or
(ii) 2 physicians; and
(7) Contain any other information that the Administration requires."

5. H–G § 10–616 reads in its entirety as follows:
"(a) *Form.*—(1) A certificate for involuntary admission of an individual under Part III of this subtitle shall:
(i) Be based on the personal examination of the physician or psychologist who signs the certificate; and
(ii) Be in the form that the Secretary adopts, by rule or regulation.
(2) The *rules and regulations shall require the form to include:*
(i) A diagnosis of a mental disorder of the individual;
(ii) An opinion that the individual needs inpatient care or treatment; and
(iii) An opinion that admission to a facility or Veterans' Administration hospital is needed for the protection of the individual or another.
(b) *Time limitations.*—A certificate may not be used for admission if the examination on which the certificate is made was done:
(1) More than 1 week before the certificate is signed; or
(2) More than 30 days before the facility or the Veterans' Administration hospital receives the application for admission.
(c) *Limitations on practitioners.*—A certificate may not be used for an admission if the physician or psychologist who signed the certificate:
(1) Has a financial interest, through ownership or compensation, in a proprietary facility and admission to that proprietary facility is sought for the individual whose status is being certified; or
(2) Is related, by blood or marriage, to the individual or to the applicant."

"Any individual proposed for involuntary admission [is] afforded a hearing to determine whether the individual is to be admitted to a facility ... as an involuntary patient or released without being admitted." H–G § 10–632(a). This hearing must "be conducted within 5 working days of the date of the initial confinement of the individual." H–G § 10–632(b). Reilly's admission hearing was conducted on August 11 at which time he was released.

Thereafter Reilly, through his trial attorney Daniel M. Zerivitz (Zerivitz), filed a claim with the Health Claims Arbitration Office (HCAO) under the Health Care Malpractice Claims Act, Md. Code (1974, 1984 Repl.Vol., 1988 Cum. Supp.), §§ 3–2A–01 through 3–2A–09 of the Courts and Judicial Proceedings Article (CJ).[6] The HCAO proceedings that followed were conducted only by the attorney member, who under CJ § 3–2A–05(c) "shall be chairman and ... shall decide all prehearing procedures[.]" A full three person panel was never convened in this case.

The chairman directed the parties to submit a statement of issues. Dr. Newman's response included seven legal issues, the last of which was "whether Claimant's conduct in bringing this action was in bad faith and without substantial justification, thereby entitling Defendant to costs, expenses and attorney's fees pursuant to Rule 1–341 of the Maryland Rules?"[7] Rule 1–341 reads:

---

6. That a claim based on an involuntary commitment must be filed with the HCAO is supported by *Long v. Rothbaum,* 68 Md.App. 569, 514 A.2d 1223 (1986) (plaintiff's claims arising out of an involuntary commitment and sounding, *inter alia,* in false imprisonment and in intentional infliction of emotional distress in fact alleged misdiagnosis of the plaintiff's condition and the subsequent rendition of unnecessary and improper care).

No issue is presented here concerning the legal necessity for Reilly initially to have submitted his claim to arbitration, and we intimate no opinion on it.

7. By order of the Court of Special Appeals the prehearing issues statement from the HCAO was made a supplement to the record from the circuit court.

"In any civil action, if the court finds that the conduct of any party in maintaining or defending any proceeding was in bad faith or without substantial justification the court may require the offending party or the attorney advising the conduct or both of them to pay to the adverse party the costs of the proceeding and the reasonable expenses, including reasonable attorney's fees, incurred by the adverse party in opposing it."

The panel chairman also requested that the parties' prehearing submissions identify expert witnesses. In response Zerivitz submitted a legal memorandum in which he argued that it was not essential to the plaintiff's case to produce expert testimony on the "standard of care" issue, that is, on whether Dr. Newman's evaluation of Reilly's mental condition was negligent. In that analysis, Zerivitz referred to the Health–General Article, including § 10–616's requirement for a "personal examination," and urged "that no expert testimony is needed to determine whether or not these statutes were violated."

Zerivitz transmitted this memorandum to the panel chairman under cover of a letter dated October 23, 1986, the relevant part of which read:

"Enclosed you will find a memo explaining the Claimant's position with regard to the need for expert witnesses. At this time, Mr. Reilly wants his day in court, and I would therefore ask that the case go forward regardless of your reactions to this memo and anything that the Defendant may file. At the very least, we ask that you allow Dr. Fetterhoff to take the stand. While it is true that at the present time he is not inclined to state an opinion regarding Dr. Newman's actions, with any luck an opinion can be coaxed from him at the hearing. That is a possibility that should not be denied the Claimant."

The panel chairman disagreed with Zerivitz's legal contention and ruled that expert testimony was required to prove a violation of the standard of care under the circumstances under which Dr. Newman acted. The panel chairman found

that the only evidence from an expert on standard of care was from Dr. Fetterhoff who, on deposition, testified that

> " 'the commonly stated attitude that we hear over and over again is that when you're in doubt ... that it's safer to certify than not, in view of the fact that the State has, in effect, safeguards to prevent Shanghaiing people and all.' "

The panel chairman entered summary judgment in favor of Dr. Newman. There was no comment by the panel chairman concerning sanctions. Dr. Newman did not request the panel chairman to consider sanctions after summary judgment had been granted. Nor did Dr. Newman request that the HCAO convene the entire panel so that it could consider sanctions.

Reilly rejected the award and filed a complaint in the Circuit Court for Washington County. He alleged, *inter alia,* that Dr. Newman had "failed to conform to the standards set by [H–G] Sections 10–613 through 10–624" by failing "properly" to examine Reilly. The complaint further alleged "a conscious, willful, [and] intentional disregard for the rights of the Plaintiff" resulting in Reilly's loss of freedom. Dr. Newman responded with a paper captioned "Motion to Strike or, in the Alternative, to Dismiss Action to Nullify Award." The thrust of the motion was that Reilly's failure to designate an expert witness for arbitration was a refusal to arbitrate in good faith. *Cf. Bailey v. Woel,* 302 Md. 38, 485 A.2d 265 (1984) (refusal to present any evidence in arbitration is a failure to satisfy condition precedent to circuit court damage suit).[8]

---

**8.** Motions to strike are governed by Md. Rule 2–322(e) which in relevant part provides:

"On motion made by a party before responding to a pleading ... the court may order any insufficient defense or any improper, immaterial, impertinent, or scandalous matter stricken from any pleading or may order any pleading that is late or otherwise not in compliance with these rules stricken in its entirety."

The grounds assigned by Dr. Newman in support of his motion are not encompassed by the foregoing rule.

Attached as exhibits to the motion were various papers from the HCAO proceedings which presented matter beyond the allegations of the complaint. The circuit court did not exclude the new matter so that the motion was to be treated as one for summary judgment governed by Md. Rule 2–501. *See* Rule 2–322(c).

Zerivitz, on Reilly's behalf, answered the motion by a legal memorandum which presented alternative positions. It first submitted that the Health–General statutes "set out the standards by which the Defendant's actions should be judged, and secondly, even if the statutes did not set out the standard of care, the facts are such that a layman could understand and determine whether or not the Defendant acted negligently." In the course of oral argument on the motion Zerivitz pointed out that H–G § 10–616 "provides that before the doctor can sign that certificate he must personally examine the individual and determine that a mental disorder exists and that the individual needs inpatient care."

The circuit court ruled from the bench. The court framed the issue to be whether the panel chairman was "in error in granting summary judgment, when confronted with the undisputed fact that there would be no expert testimony offered as to standard of care, correct diagnosis, or what constitutes a proper examination[.]" The judge did "not believe that any of those questions are the subject of lay testimony." The circuit court ordered Reilly's complaint dismissed and that order was entered on the docket on February 3, 1987. No appeal was noted within thirty days from that final judgment.

On March 5, 1987, Dr. Newman moved that

"Plaintiff or his attorney or both be ordered to pay Defendant[ ] the costs, reasonable expenses and reasonable attorney's fees incurred by Defendant[ ] in opposing Plaintiff's Statement of Claim filed in the Health Claims Arbitration Office and his Action to Nullify and Complaint filed in the Circuit Court for Washington County."

The motion was accompanied by the time records of defense counsel, supported by affidavit and by various papers from the HCAO proceedings.[9] In opposition Reilly filed a legal memorandum which incorporated by attachment Reilly's HCAO memorandum concerning the need for expert witnesses. Reilly's memorandum again submitted that the trier of fact should have been allowed to use the requirements of the Health–General Article "as guidance to determine the standard of care under which Defendant Newman was to have acted."

The court, without further hearing, granted sanctions for the reasons stated in a written opinion.[10] The court found that "Reilly and his attorney initiated this claim before the Health Claims Arbitration Board either without any investigation and/or in total disregard of the necessity to prove the applicable standard of care and/or a breach thereof or causation." It found that the "sum and substance of the

---

**9.** The motion for sanctions alleged that, prior to the summary judgment in arbitration, "counsel for Plaintiff had represented to both the Panel Chairman and defense counsel that Dr. Ira Fetterhoff had agreed to provide an expert opinion on Plaintiff's behalf." The motion cites an attached exhibit B for support and then avers that "in reality Dr. Fetterhoff had never agreed to testify as an expert on Plaintiff's behalf." Exhibit B does not support the allegation. The exhibit is part of Reilly's answer of September 1985 to Dr. Newman's interrogatories. In response to the interrogatory asking the identity of expert witnesses, Reilly replied that the determination had not been made and Reilly reserved the right to supplement the answer.

Dr. Newman's appendix includes a July 18, 1986, letter from Zerivitz to counsel for the defendant which is not part of Exhibit B. The letter refers to the interrogatory concerning experts, advises that a written report from Dr. Fetterhoff had been previously furnished and represents that substantially everything that Dr. Fetterhoff had told Zerivitz was contained in those written reports. Again, we see nothing in this letter to support the charge against Zerivitz made in the motions.

**10.** Neither Newman, when filing his motion for costs, nor Reilly, when filing his response, requested a hearing. Three days after Reilly's response Dr. Newman requested a hearing. Under Md. Rule 2–311(f) Dr. Newman's request was untimely. Even if a post judgment motion for sanctions under Rule 1–341 is a "claim" within the meaning of Rule 2–311(f), the court was free to dispose of the claim and of the defense thereto without a hearing.

Plaintiff's claim seems to be summed up in [the] letter dated October 23, 1986" in which counsel for the plaintiff had written that " 'with any luck, an opinion can be coaxed' out of Dr. Fetterhoff when he testifie[s] before the panel." The court went on to say that it

"finds as a fact that this proceeding from its inception was filed without substantial justification. The Plaintiff's claim is frivolous and devoid of merit without proof of a violation of the applicable standard of care or causation. He totally failed to present to the Arbitration Panel a good faith effort to establish his case. This court agrees with the Defendant[ ] that this suit should never have been filed, that it lacked justification from its inception and further that it was unsupported by any plausible legal argument."

Defense counsel's time records aggregated 205.8 hours of services in arbitration and in the circuit court. The court applied $100 per hour as a reasonable rate and awarded attorney's fees of $20,580 to which were added costs of $585.05 for a total award of $21,165.05.

At the foot of its opinion was the court's order, dated April 1, 1987, "that a judgment in favor of the Defendant[ ] be entered against Luke R. Reilly in the amount of $10,-583.53 and against Daniel M. Zerivitz in the amount of $10,583.52." [11] A docket entry dated April 2, 1987, reads:

"Memorandum Opinion and Order of Court dated the 1st day of April, 1987, ORDERED that a judgment in favor of the Defendant[ ] be entered against Luke R. Reilly in the amount of $10,583.53 and against Daniel M. Zerivitz in the amount of $10,583.52. (Judge Corderman) filed; cc: Counsel of Record[.]"

Another docket entry dated April 3, 1987, reads:

"Judgment entered in favor of George C. Newman, II ... against Luke R. Reilly in the amount of $10,583.53 and

---

**11.** The individual judgments each exceed one-half of the total amount awarded by one dollar.

judgment entered in favor of George C. Newman, II ...
against Daniel M. Zerivitz in the amount of $10,583.52
this date[.]"

On April 23, 1987, an order for appeal was docketed. It
was signed by Zerivitz as "Attorney for Plaintiff" and
reads:

> "Please enter an appeal on behalf of the Plaintiff to the
> Court of Special Appeals from the Judgment, in the above
> captioned matter, in favor of the Defendants, George C.
> Newman, II M.D., et al., dated April 1, 1987 and entered
> on April 2, 1987."

The three issues with which we introduced this opinion
were presented to the Court of Special Appeals. It held
that the circuit court had no authority to impose sanctions
for conduct in health claims arbitration. The court decided
"that the trial judge was not clearly erroneous in conclud-
ing that the action to nullify the award was maintained in
the circuit court without substantial justification and that
he did not abuse his discretion in imposing the sanction
authorized by Rule 1–341." *Reilly v. Newman*, 74 Md.App.
281, 289, 536 A.2d 1230, 1233–34 (1988). The intermediate
appellate court also ruled that the order for appeal "made
no mention of an appeal from the separate judgment en-
tered against" Zerivitz. *Id.* at 288, 536 A.2d at 1233. Thus
the Court of Special Appeals let stand the sanction of
$10,583.52 imposed on Zerivitz. As to Reilly, the court
remanded for exclusion from the sanction imposed on him
one-half of the cost of defense in the HCAO proceedings.
We granted cross-petitions for certiorari.

## I

The Court of Special Appeals separately considered
and rejected Rule 1–341 and CJ § 3–2A–07(a) as potential
authorizations for the circuit court to have imposed sanc-
tions in this case for conduct in HCAO proceedings. It
reasoned that Rule 1–341 by its terms applies "[i]n any civil
action" and that under Rule 1–202(a) " '[a]ction' means
collectively all the steps by which a party seeks to enforce

any right in a court[.]" Because HCAO arbitration is not a proceeding in a court, the intermediate appellate court held that Rule 1–341 does not apply to the HCAO proceedings.

Dr. Newman urges that the proceedings administered by the HCAO and the action to nullify in a circuit court be treated as one continuous enforcement, all parts of which comprise a "civil action" under Rule 1–341. He points out that in malpractice cases the time as of which diversity of citizenship is determined is the date of filing of the claim with the HCAO. *See Rowland v. Patterson*, 852 F.2d 108 (4th Cir.1988). He draws a variety of illustrations from provisions of the Health Care Malpractice Claims Act to demonstrate that, in cases of medical malpractice, "action" embraces HCAO arbitration.

The short answer to these contentions is that Rule 1–341 was adopted by this Court in the exercise of its rulemaking power under Maryland Constitution art. IV, § 18(a) which concerns "the practice and procedure in and the administration of the appellate courts and in the other courts of this State[.]" By CJ § 3–2A–03(a) the HCAO "is created as a unit in the Executive Department. It is headed by a Director appointed by the Governor with the advice and consent of the Senate." The interpretation urged by Dr. Newman raises substantial questions concerning the constitutional power of this Court to regulate conduct before an executive agency. We therefore interpret Rule 1–341 not to include within the sanction power of a circuit court the power to sanction conduct in HCAO proceedings.

The Court of Special Appeals also correctly held that CJ § 3–2A–07(a) could not apply here. The statute provides:

"If the arbitration panel finds that the conduct of any party in maintaining or defending any action is in bad faith or without substantial justification, the panel may require the offending party, the attorney advising the conduct, or both, to pay to the adverse party the costs of the proceeding and reasonable expenses, including rea-

sonable attorney's fees, incurred by the adverse party in opposing it. A determination made under this subsection shall become part of the panel award and subject to judicial review."

This statute confers the power on the panel, and not on the panel chairman. Dr. Newman never sought to have a panel convened for the purpose of entertaining an application for sanctions. Thus, even though the determination made under § 3–2A–07(a) is "subject to judicial review," the matter was not preserved.

Before this Court Dr. Newman takes a somewhat different tack. He points out that under CJ § 3–2A–05(a)(1) "all issues of law shall be referred by the Director [of the HCAO] to the panel chairman." Under CJ § 3–2A–02(c), "[e]xcept as otherwise provided, the Maryland Rules of Procedure shall apply to all practice and procedure issues arising under this subtitle." Dr. Newman submits that § 3–2A–02(c) makes applicable in HCAO arbitration a power to sanction which is coextensive with that in Rule 1–341. Under Rule 1–341 the determination of sanctions is for the court. Similarly, Dr. Newman submits, the panel chairman, acting alone, can apply § 3–2A–02(c)'s incorporation of Rule 1–341 without a full panel having been convened. The argument is that Dr. Newman made such an application to the panel chairman in the proposed issues submitted by him, that the panel chairman neglected to rule on the application, and that under those circumstances the circuit court could act on the application in Reilly's action to nullify the award to the same extent as if the application had been explicitly denied by the chairman.

Dr. Newman's analysis presupposes two sources of sanction power in HCAO arbitration, one resting with the panel and conferred by § 3–2A–07(a) and the other resting with the chairman alone and derived from Rule 1–341's assumed incorporation into § 3–2A–02(c). Both § 3–2A–02(c) and § 3–2A–07(a) were added to the Health Care Malpractice Claims Act by Ch. 640 of the Acts of 1986 which was effective July 1, 1986, and made applicable to "all cases

open" in the HCAO on that date. *See* SEC. 2 of Ch. 640. If the reference in § 3–2A–02(c) to the Maryland Rules of Procedure includes Rule 1–341, and if the panel chairman acts as a judge acts under Rule 1–341, then nothing limits the chairman's power of acting alone to the period before a panel has been appointed so that the chairman could act alone under the § 3–2A–02(c) power urged by Dr. Newman even after the full panel is selected. This interpretation creates a conflict between § 3–2A–07(a) and § 3–2A–02(c), particularly if the chairman were to reach one conclusion and the remaining two panel members reached the opposite conclusion.

The language used in § 3–2A–07(a) reflects that the legislative purpose was to make the imposition or denial of sanctions in HCAO arbitration a matter for the panel and not simply for the chairman. Sanctions may be imposed only if the "panel finds" misconduct. By specifying that "[a] determination made under [§ 3–2A–07(a)] shall become part of the panel award and subject to judicial review," the General Assembly has indicated that a "determination" to grant or deny sanctions is to be part of an award made by a panel. Because § 3–2A–07(a) more particularly expresses the legislative purpose with respect to sanctions than does the general reference to rules of procedure in § 3–2A–02(c), the conflict must be resolved in favor of the former, more specific statute. Accordingly, we agree with the conclusion reached by the Court of Special Appeals on this issue.[12]

---

**12.** Dr. Newman additionally submits that, after an award on the merits by a panel chairman, it would not be possible for the HCAO to convene a panel to consider an application by the prevailing party for sanctions against the losing interests because the losing interests could oust the HCAO of jurisdiction by instituting an action to nullify. That problem is not factually presented on this record. If this problem is governed by analogy to actions in courts, we simply observe that, under the majority rule, an appeal from a trial court judgment on the merits does not deprive the judgment-rendering court of jurisdiction to consider an award of counsel fees. *See Budinich v. Becton Dickinson & Co.*, 486 U.S. ——, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988); *Maryland–Nat'l Capital Park & Planning Comm'n v. Crawford,* 307 Md.

## II

"In order to impose sanctions [Rule 1–341] requires the trial judge to find one or both of two predicates: 'bad faith' or 'lack of substantial justification'." *Yamaner v. Orkin*, 313 Md. 508, 509, 545 A.2d 1345, 1345 (1988). Here the circuit court found a lack of substantial justification. By the time Reilly's claim was asserted in the circuit court, it was clear to Reilly and to Zerivitz that they were not going to get from Dr. Fetterhoff an opinion that Dr. Newman had violated the applicable standard of care, and there was no other expert even remotely in the picture to support the plaintiff's claim. But the plaintiff's point in pursuing the claim beyond arbitration was that the statutes governing involuntary commitments established a required procedural standard and that those statutes had been violated. Thus, depending upon what H–G § 10–616(a)(1)(i) meant by requiring a "personal examination," Dr. Newman's certification may or may not have complied with the statutes authorizing involuntary admission to a facility.

Dr. Newman's only contacts with Reilly prior to the former's certification of the latter's need for inpatient care were the three telephone conversations on August 7, 1983. Reilly's position was that those contacts fell short of the statutory standard. If a physician's conversations with a voice on the telephone do not constitute a "personal examination," then Dr. Newman arguably initiated an unauthorized seizure of Reilly's person and committed the tort of false imprisonment. The circuit court, however, concluded that the plaintiff's position "was unsupported by any plausible legal argument." We disagree.

"Rule 1–341 is not intended to penalize a party and/or counsel for asserting a colorable claim or defense." *Yamaner*, 313 Md. at 516, 545 A.2d at 1349. *Yamaner* cited favorably *Legal Aid Bureau, Inc. v. Farmer*, 74 Md.App. 707, 539 A.2d 1173 (1988), a case in which the substantial

---

1, 38–40, 511 A.2d 1079, 1098–99 (1986); *Dent v. Simmons,* 61 Md.App. 122, 129–30, 485 A.2d 270, 273–74 (1985).

justification for counsel's recommending and pursuing an appeal from an adverse judgment of the District Court of Maryland was counsel's interpretation of the relevant statutes. While the Court of Special Appeals in *Legal Aid Bureau* agreed with counsel's interpretation, the test under Rule 1–341 is only that the legal position be "fairly debatable" to constitute substantial justification. *See Yamaner v. Orkin,* 310 Md. 321, 328, 529 A.2d 361, 365 (1987) (whether order of circuit court was properly interpreted to have imposed sanctions on counsel was fairly debatable, as was the applicability of collateral order doctrine had counsel been sanctioned, so that there was substantial justification for immediate appeal). Thus, we need not decide here on the proper meaning of "personal examination." We hold only that there was substantial justification for advancing the meaning on which Reilly's legal position rested.[13]

H–G § 10–616(a)(1)(i) is at least ambiguous. The ordinary, lay use of "personal examination" arguably connotes face-to-face contact in which the physician sees, as well as hears, the person examined. Further, it is well within the realm of "legitimate advocacy," *Farmer,* 74 Md.App. at 722, 539 A.2d 1173, to contend that the legislative purpose of a "personal examination" is to establish a procedural safeguard of the liberty of persons who are the subjects of contemplated involuntary commitment by requiring in all cases the subject's physical presence before the examining physician. This would be so even if the medical profession were to accept as a proper certification one based upon telephone conversations with the subject. On this "legitimate" theory of the case, the plaintiff did not need a medical expert. The trial court, if it agreed with the legal

---

**13.** This well-settled law demonstrates that there is no merit in Dr. Newman's issue preclusion argument. Because there was no order for appeal filed within thirty days of the final judgment on the merits entered February 3, 1987, Dr. Newman contends that "res judicata" bars a defense to sanctions based on the validity of the claim asserted by Reilly. There is no preclusion inasmuch as the issue on the merits is different from the issue under Rule 1–341.

contention, would instruct the jury on Dr. Newman's statutory duty.

Nor did the circuit court find bad faith. The circuit court's statement that Reilly "totally failed to present to the Arbitration Panel a good faith effort to establish his case" is based on the legal conclusion that expert testimony was absolutely required and that there was no plausible legal argument to the contrary. Whatever support the "coaxing" letter might have had for a finding of no substantial justification for asserting the claim in arbitration, that letter has no bearing on the justification for continued prosecution of the claim in circuit court. By that time the plaintiff's theory clearly and exclusively was that no expert opinion was required.

Accordingly, we hold that the circuit court erred in concluding that the prosecution of Reilly's claim in the circuit court was without substantial justification.

## III

We now consider whether this appeal includes review of the judgment against Zerivitz. The circuit court entered judgments against both Zerivitz and Reilly which were separate in the sense that each judgment debtor was liable for $10,583 and change. The circuit court took pains to ensure that Reilly and Zerivitz respectively would be obligated to pay half of the total assessment and structured its order to avoid imposing joint and several liability on both the plaintiff and his counsel for one total sum. The Court of Special Appeals held that the order for appeal filed in this case was not an appeal by Zerivitz from the separate judgment against him.

That conclusion is based on the phraseology of the order: "Please enter an appeal on behalf of the Plaintiff to the Court of Special Appeals from the Judgment, in the above captioned matter, in favor of the Defendant[.]" The theory of the Court of Special Appeals is that there is but one plaintiff, Reilly—and Zerivitz is his attorney. Thus, the

words in the order for appeal, "on behalf of the Plaintiff," and, "Judgment," are read by Dr. Newman and the intermediate appellate court as words of limitation, circumscribing the scope of a timely and, as we have seen above, meritorious appeal.

The Maryland Rules do not regulate the content of an order for appeal to the Court of Special Appeals. When the subject order was filed, the governing rule was former Rule 1011.a which provided that an appeal to the Court of Special Appeals "shall be taken by filing an order for appeal with the clerk of the lower court[.]" Current Rule 8–201(a) is similarly silent concerning content of the order for appeal.[14] In civil cases the judgments and rulings complained of by an appellant are not required to be identified until the filing of the information report required by Rule 8–205 or the filing of the appellant's brief. By contrast, Federal Rules of Appellate Procedure, Rule 3(c), requires that

> "[t]he notice of appeal shall specify the party or parties taking the appeal; shall designate the judgment, order or part thereof appealed from; and shall name the court to which the appeal is taken.... An appeal shall not be dismissed for informality of form or title of the notice of appeal."

Inasmuch as the Maryland rule does not by its terms require that the body of the order for appeal identify the party appealing or the judgment appealed from, the limitation on the scope of this appeal applied by the Court of Special Appeals rests on language gratuitously included in the body of the order. If Zerivitz had signed, as attorney for the plaintiff, a paper reading, "Please note an appeal to the Court of Special Appeals" and the paper were filed within thirty days of the entry of the sanctions judgments, the legal effect would have been to bring up for appellate review all appealable judgments in the case.

---

**14.** The form, signing, and service of an order for appeal are governed by general provisions relating to court papers, including Rules 1–301, 1–311 and 1–321.

Under former Rule 604 b sanctions could only be imposed against a party so that the relatively clear distinctions between a party and that party's counsel were maintained. Rule 1–341, effective July 1, 1984, permits imposition on "the offending party or the attorney advising the conduct or both of them[.]" The current rule recognizes that the common interest of the attorney and the client in the cause or defense can lead the attorney to excesses which must be sanctioned. This leads to orders running against the client and the attorney, thereby blurring the previous, relatively clear distinction between the client as party and the attorney as counsel.

The appellate jurisprudence of this State which has developed in Rule 1–341 cases recognizes the attorney who has been sanctioned to be a "party" to the case for purposes of the right to appeal. Under CJ § 12–301 "a party may appeal from a final judgment entered in a civil ... case by a circuit court," except as provided in § 12–302. The Court of Special Appeals, in *Legal Aid Bureau v. Farmer*, 74 Md.App. 707, 539 A.2d 1173 (1988), decided two months after that court's decision in the instant case, expressly held that a judgment under Rule 1–341 rendered against an attorney by a circuit court is appealable to the Court of Special Appeals under CJ § 12–301. Direct appeals by counsel from judgments of sanction against them have also been entertained in *Legal Aid Bureau v. Bishop's Garth Assocs. Ltd. Partnership*, 75 Md.App. 214, 540 A.2d 1175 (1988) and in *Watson v. Watson*, 73 Md.App. 483, 534 A.2d 1365 (1988).[15] The Court of Special Appeals in *Farmer* was unwilling to conclude that Rule 1–341 sanction orders against attorneys were absolutely unreviewable. Recognizing that it "must fit [such judgments] in one place or the

---

15. In *Watson* the order for appeal was entered "'on behalf of Plaintiffs [naming them] and non-party [naming the attorney].'" 73 Md. App. at 488 n. 3, 534 A.2d at 1368 n. 3. If taken literally, this order for appeal would have negated the attorney's appeal by making CJ § 12–301 inapplicable to him.

other," the *Farmer* court placed them under CJ § 12–301. 74 Md.App. at 712, 714, 539 A.2d at 1175–76. We agree.

■ The right of the sanctioned attorney to appeal is as a "party" under § 12–301. In the context of the instant case that means as a party plaintiff. We do not consider an application for sanctions to be a claim so distinct from the underlying lawsuit that the parties would be realigned depending on who is claiming, and who is defending against, sanctions. Indeed, we have held that a sanctions order against a party to the underlying litigation is not immediately appealable, in advance of final judgment on the merits of the underlying action, under the collateral order doctrine. *See Yamaner v. Orkin,* 310 Md. 321, 529 A.2d 361 (1987).

Dr. Newman places considerable reliance on *Farmer* for the proposition that a sanction order against an attorney is collateral to the underlying litigation, and from this Dr. Newman concludes that an order for appeal "on behalf of the Plaintiff" cannot embrace the plaintiff's attorney. *Farmer* recognized "that judgments of this type have been regarded as collateral to the underlying action for some purposes but not for others." 74 Md.App. at 712, 539 A.2d at 1175. *Farmer* held that the order involved there was collateral. That holding, however, concerned a different aspect of appealability from that with which we are concerned here. The underlying action in *Farmer* was an appeal to a circuit court from the District Court and it was the circuit court which imposed sanctions on an attorney. Under CJ § 12–302(a) there is no appeal of right from a circuit court when it exercises appellate jurisdiction in reviewing a judgment of the District Court. Thus, one issue faced by the Court of Special Appeals was whether the sanction should be treated as part of an appeal from the District Court, thereby precluding appeal to the Court of Special Appeals and leaving available only certiorari review by this Court. The Court of Special Appeals held that the sanction against the attorney was "sufficiently collateral to the underlying action as to fall within [its] bailiwick." 74

Md.App. at 712, 539 A.2d at 1175. Accordingly, the *Farmer* court held that the appeal was before it under § 12–301 and was not governed by § 12–302. The case before us was an original action in the circuit court. Zerivitz's right to appeal is that conferred by CJ § 12–301 upon "a party."

Viewed in this light, the order for appeal in the instant case does not operate to exclude Zerivitz. Our cases, and those of the Court of Special Appeals, have generally been quite liberal in construing timely orders for appeal. In *Anderson v. Stewart,* 108 Md. 340, 70 A. 228 (1908), suit was filed by A but, before any plea was filed, the suit was entered to the use of B, C and D, partners. After judgment for the defendant, an order for appeal was filed which read, " 'Please enter an appeal in the above entitled case to the Court of Appeals of Maryland' ", and which was signed by counsel as " 'Attorneys for *Plaintiff.*' " *Id.* at 346, 70 A. at 230. The appellee moved to dismiss the appeal on the ground that the singular, " '*Plaintiff,*' " indicated the appeal was for A only and not for the equitable plaintiffs. Because A had no interest in the result of the suit, the appellee submitted that A had no standing to appeal. The Court was "of opinion that this appeal should be treated as taken for all the parties plaintiffs both legal and equitable." *Id.* at 347, 70 A. at 231. Applicable was an 1881 case where the lower court had arrested judgment in an action brought by a husband and wife because the declaration concluded with an allegation of damage to the "plaintiff," in the singular. This was said to be " 'a mere clerical misprision in the pleader, the omission of a letter s.' " *Anderson v. Stewart,* 108 Md. at 348, 70 A. at 231 (quoting *Newcomer v. Kean,* 57 Md. 121, 123 (1881)).

Similar is *Christy v. Hammond,* 161 Md. 139, 155 A. 322 (1931). There the plaintiff sued A, B and C, partners. At trial proof disclosed the partnership intended to be sued was that of B and C. The plaintiff amended the writ and declaration accordingly. After judgment for the plaintiff an order of appeal was filed under the original titling, with A, B and C as partners, the defendants. In rejecting a

motion to dismiss the appeal, the Court said that "[t]his inadvertent omission to make the titling conform to the authorized amendment should not affect the evident purpose of the actual defendants to have the judgment against them reviewed." 161 Md. at 144, 155 A. at 324.

Judgment was entered against five defendants in *Joppa Sand & Gravel Corp. v. L. Epstein & Sons, Inc.*, 39 Md.App. 34, 382 A.2d 1086 (1978), but the order for appeal from the judgment described it as "adverse to the Defendant, [naming one]." The court held that the quoted phrase "was surplusage, and may not be construed to limit the notice of appeal to [the named defendant] alone." *Id.* at 43, 382 A.2d at 1092. In *Lowenthal v. Rome*, 57 Md.App. 728, 471 A.2d 1102 (1984), the order for appeal indicated that it was on behalf of a person who was no longer a party in the case. Pilar Lowenthal and her children had sued the personal representatives of her former husband's estate. An earlier appeal in the case had held that Pilar was not the surviving widow. On remand, the children's claims proceeded, resulting in judgment for the estate. The order for appeal captioned the case with "Pilar Lowenthal," as plaintiff and did not even refer to the children by "et al." Denying a motion to dismiss, the Court of Special Appeals pointed out that the removal of the mother from the case "did not affect the children's continuing standing as parties to the proceedings" and that the estate "had more than adequate notice that a timely appeal had been filed and who the parties bringing the appeal were." *Id.* at 738, 471 A.2d at 1107.

The philosophy of these cases is also reflected in the Notes of the Advisory Committee on the Federal Rules of Appellate Procedure, 1979 Amendment, Note to Rule 3, subdivision c:

"Because of the fact that the timely filing of the notice of appeal has been characterized as jurisdictional ... it is important that the right to appeal not be lost by mistakes of mere form. In a number of decided cases it has been held that so long as the function of notice is met by the

filing of a paper indicating an intention to appeal, the substance of the rule has been complied with."

Here, in the written response to Dr. Newman's motion for sanctions against Reilly, or Zerivitz, or both, they presented a common defense. After sanctions were imposed against both, Zerivitz as well as Reilly had a right to appeal as a "party." No substantial reason appeared at the time the order for appeal was filed, and none has appeared since, to indicate that Zerivitz waived his right of appeal or to indicate that the use of the singular in referring to the plaintiff and to the judgment was a deliberate limitation. Were the issue before us the interpretation of one of the Maryland Rules, the singular would include the plural. *See* Rule 1–201(d). Where, as here, there is a commonality of interest between Reilly and Zerivitz, and the imprecision in drafting the order for appeal caused no prejudice to Dr. Newman, we hold that the timely order for appeal brought up for review the judgment against Zerivitz as well as that against Reilly.

Dr. Newman asserts that there is a conflict of interest, and not a commonality of interest, between Reilly and Zerivitz once sanctions were sought and, certainly, once sanctions were imposed, so that the order for appeal cannot embrace both. From the standpoint of legal ethics, the problem presents an indirect adversity governed by The Maryland Lawyers' Rules of Professional Conduct, Rule 1.7(b) which provides in relevant part:

"A lawyer shall not represent a client if the representation of that client may be materially limited ... by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation."

The conflict is that it may be in the client's best interest to defend against the sanction by putting all of the blame on the attorney. Without intending to minimize the seriousness of the ethical problems which can arise in sanctions

situations, we fail to see the relevance of Dr. Newman's argument to the issue before us. The attorney whose client is the object of a sanctions request may proceed to oppose the request with client consent after "consultation" as that term is further explained by Professional Conduct Rule 1.7(c). We can only assume on this record that the Rules of Professional Conduct have been complied with here and, if they have not, it is initially a matter for another forum in a different proceeding. But this has no bearing on our holding concerning the legal effect of the particular order for appeal in this case.

## IV

For the foregoing reasons we reverse the judgment of the Court of Special Appeals insofar as it affirmed the sanctions.

The total amount of the sanctions consists of an amount for attorney's fees, the arbitration costs certified to the circuit court by the HCAO Director and, apparently, the appearance fees for plaintiff's and defendant's counsel. Arbitration costs, including the arbitrator fees, are included in the award in arbitration. *See* CJ § 3-2A-05(f). The circuit court confirmed the award in the instant matter as part of its judgment on the merits entered February 3, 1987. A confirmed award is a final judgment. CJ § 3-2A-05(i). Thus there was a doubling up as to those arbitration costs, as well as of any appearance fees, by additionally including them in the sanctions judgments. Reversal of the sanctions judgments will still leave the arbitration costs and appearance fees as part of the judgment on the merits against Reilly.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THAT COURT FOR THE ENTRY OF A JUDGMENT REVERSING THE JUDGMENT OF APRIL 2, 1987, AND, AS REENTERED, OF APRIL 3, 1987, OF THE CIRCUIT COURT FOR WASHINGTON COUNTY AND REMANDING THIS CASE TO THE CIR-

**390**

CUIT COURT FOR WASHINGTON COUNTY FOR THE ENTRY OF A JUDGMENT DENYING THE MOTION FOR SANCTIONS. COSTS TO BE PAID BY GEORGE C. NEWMAN, II, M.D. AND NEWMAN, WAGSHAL, WOOSTER & KASS, P.A., THE PETITIONERS AND CROSS–RESPONDENTS.