730 A.2d 759

**James L. MULLANEY, et al.**

v.

**Betty Sue AUDE.**

**No. 862, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

June 3, 1999.

Benjamin Lipsitz (Alan Edgar Harris, on the brief), Baltimore, for appellants.

Susan R. Green, Baltimore (Gary S. Bernstein, Towson, on the brief), for appellee.

Argued before THIEME, KENNEY and ADKINS, JJ.

ADKINS, Judge.

This case involves the adversarial use of gender bias in the discovery process. James L. Mullaney, Esq. and Allan E. Harris, Esq., appellants, appeal from the imposition, pursuant to Maryland Rule 2–433, of attorneys' fees incurred in obtain-

ing a protective order against them. Appellants ask us to determine whether: 1) the attorneys' fee award was invalid because it was imposed after a final judgment in the underlying tort action was entered; 2) appellants' conduct during pretrial discovery warranted a protective order on grounds that it was racist, sexist, or encumbered discovery; 3) the evidence was sufficient to support the dollar amount of the award ($1,500); and 4) a procedural irregularity in the court's granting of the original protective order invalidated the subsequent fee award.

### FACTS AND PROCEDURAL BACKGROUND

Betty Sue Aude, appellee, brought a tort action for fraud, negligence, intentional infliction of emotional distress, and battery against Mr. Mullaney, alleging that he infected her with genital herpes. Susan R. Green, Esq. and Gary S. Bernstein, Esq. represented Ms. Aude. Mr. Mullaney was represented by Mr. Harris and Benjamin Lipsitz, Esq. After a trial, the jury found that Mr. Mullaney negligently infected Ms. Aude with genital herpes, but that Ms. Aude was contributorily negligent. Accordingly, judgment was entered in favor of Mr. Mullaney on December 10, 1996.

### Appellants' Deposition Conduct

During the course of pre-trial discovery, Ms. Aude was deposed. At the deposition, she was asked about a document that she failed to bring with her. As Ms. Aude was leaving the room to retrieve that document, Mr. Harris remarked that she was going to meet "[a]nother boyfriend" at the car. Ms. Green and Mr. Bernstein quickly told Mr. Harris that his comment was in poor taste and asked him to refrain from making further derogatory comments. The following ensued:

MR. MULLANEY: It's going to be a fun trial.

MR. HARRIS: It must have been in poor taste if Miss Green says it was in poor taste. It must have really been in poor taste.

MS. GREEN: You got a problem with me?

MR. HARRIS: No, I don't have any problem with you, babe.

MS. GREEN: Babe? You called me babe? What generation are you from?

MR. HARRIS: At least I didn't call you a bimbo.

MR. LIPSITZ: Cut it out.

MS. GREEN: The committee will enjoy hearing about that.

MR. BERNSTEIN: Alan, you ought to stay out of the gutter.

### Appellants' Interaction With Experts

Following the deposition,[1] in November 1994, appellee filed a motion to require a physical examination of Mr. Mullaney and the court ordered him to submit to an exam. Specifically, he was ordered to have his blood drawn and tested at a lab at the University of Maryland School of Medicine. Pursuant to the order, Mr. Mullaney presented himself, accompanied by Mr. Harris, to Dr. Laure Aurelian, the plaintiff's expert witness in virology and the herpes simplex virus.

Apparently, his experience at the hospital was not a pleasant one. Within a week of this visit, on March 28, 1995, Mr. Mullaney wrote to James Ralls, Program Administrator of the Complaint and Quality Assurance Unit of the Office of Licensing and Certification Programs at the Maryland Department of Health and Mental Hygiene. His letter and accompanying affidavit complained about Dr. Aurelian, Dr. Shinichi Imafuku, the individual who attempted to draw blood from his arm, and the cleanliness of the facility.[2] In his letter, he emphasized

---

**1.** According to Ms. Green's legal assistant, Tracey Christopher, Harris's reference to Ms. Green as "babe" continued throughout the course of litigation. In an affidavit filed in support of Ms. Green's motion for sanctions, Ms. Christopher stated that "in the course of [her] employment, ... counsel for James Mullaney, did telephone Ms. Green's office and ask [her], 'Is the babe in'?" He also referred to Ms. Christopher as "babe."

**2.** Mr. Mullaney made various criticisms of the room where his blood was taken, characterizing it as "more of a storage area, dirty, with old

that "what is the most disturbing is that this woman [referring to Dr. Aurelian] is referred to as 'doctor'" when she "has a doctorate in philosophy." In fact, Dr. Aurelian holds a Ph.D. from Johns Hopkins University in microbiology, and specializes in the field of virology, holding the positions of Professor in the Department of Pharmacology and Experimental Therapeutics, and Director of the Virology/Immunology Laboratories, at the University of Maryland School of Medicine. Mr. Mullaney also complained that Dr. Aurelian was "using state facilities, equipment and time to prepare a ... private civil case where she is being paid as an expert witness."

In May, Mr. Mullaney complained about Dr. Aurelian to the President of the University of Maryland School of Medicine, and sent to him a copy of his letter and affidavit previously sent to Mr. Ralls. In this letter he said: "I can only re-emphasize my views and complaints against the non-medical person using the facilities of your hospital for such purposes."

### Motion For Protective Order

In response to appellants' actions previously described, Ms. Aude filed a motion for a protective order on August 15, 1995. In addition to describing the behavior at the deposition, appellee alleged that appellants verbally abused her expert witness, Dr. Aurelian, by contacting her, her associates, her supervisors, and various professional and regulatory agencies in the field of medicine. It was also alleged that Mr. Mullaney knew that Dr. Aurelian was not a medical doctor because her full *curriculum vitae* was attached to the motion asking the court to order the blood test. Appellee also contended that appellants caused an investigation of Dr. Aurelian by Senior Counsel for the University of Maryland which caused "great embarrassment, and harassment and humiliation...." Appellee argued in the motion that Mr. Mullaney's conduct was "designed solely to harass, annoy, embarrass and intimidate Plaintiff's designated expert to preclude her from testifying."

---

bottles and various items used for purposes other than medical testings of human beings."

Appellee also alleged that Mr. Mullaney "made racist remarks about [Dr. Imafuku] indicating he looked like he should be working in a Chinese restaurant...." Appellee asserted that Dr. Imafuku was a medical doctor, even though not licensed in Maryland. Appellee requested the following relief in the motion:

A. That the Court order the Defendant and his family members to cease all contact with the Plaintiff and her family absent participation of *all counsel.*

B. That the Court order the Defendant and his counsel to cease and desist any further contact with Dr. Laure Aurelian, her associates, [and] The University of Maryland....

C. That the Court order Mr. Harris and the Defendant to refrain from further use of racist or sexist language in dealing with anyone associated with this case.

D. That the Court [s]anction the Defendant and Mr. Harris for their actions and impose a monetary [s]anction to compensate Dr. Aurelian for the endless hours of aggravation she endured in having to defend these spurious allegations.

E. That the Court [s]anction the Defendant and Mr. Harris for their actions and impose a monetary sanction to compensate Plaintiff's counsel for the hours spent responding to the unprofessional and inappropriate behavior of Defendant and counsel Mr. Harris demanding he refrain from sexually harassing the undersigned counsel and her employees, as well as numerous letters and telephone calls regarding the Complaints and harassment of [Dr.] Laure Aurelian, Plaintiff's expert.

F. That the Court Order the Defendant and Mr. Harris to pay for the attorneys [sic] fees and costs of the filing of this Motion and for the hearing of this matter.

Judge William O. Carr ruled, in a letter order, that appellants were to have no contact with the "Plaintiff's expert, the expert's employer or with any professional body or regulatory agency regarding the Plaintiff's expert" unless expressly per-

mitted by the court. Judge Carr also prohibited appellants' contact with Ms. Aude or her family. The court reserved judgment on appellee's request for attorneys' fees.

### Sanctions Hearing and Order

Judge Stephen M. Waldron presided over the jury trial. On December 12, 1996, two days after judgment was entered in the underlying tort action, Ms. Green wrote a letter to Judge Waldron requesting a ruling on her previous request for attorneys' fees made in the motion for a protective order. As a result of Ms. Green's letter, Judge Waldron held a hearing on May 13, 1997. In February 1998, the court issued a Memorandum Opinion and Order. In the order, the court explained that it excluded as a basis for an award any claimed conduct that "did not interfere with discovery or fit within the purview of activity meant to be protected by Maryland Rule of Procedure 2–403." The court determined that $1,500 was the reasonable attorneys' fees incurred in preparing the protective order and attending the hearing. It awarded $1,500 for attorneys' fees to appellee and entered judgment in that amount against Mr. Mullaney and Mr. Harris, jointly and severally. This appeal followed.

### DISCUSSION

### I.

### Background Law of Discovery and Standard of Review

The discovery process is an important and valuable process for all participants in a legal action. *See U.O. Colson Co. v. Goff,* 204 Md. 160, 162–63, 102 A.2d 548 (1954). "[A]mple discovery before trial, under proper regulation, accomplishes one of the most necessary ends of modern procedure[.]" *Id.* at 162, 102 A.2d 548. As former Chief Judge Murphy said for the Court of Appeals in *Klein v. Weiss,* 284 Md. 36, 395 A.2d 126 (1978):

> One of the fundamental and principal objectives of the discovery rules is to require disclosure of facts by a party litigant to all of his adversaries, and thereby to eliminate, as

far as possible, the necessity of any party to litigation going to trial in a confused or muddled state of mind, concerning the facts that give rise to the litigation.

*Id.* at 55, 395 A.2d 126. Further,

because 'the sound and expeditious administration of justice' is served when all parties are aware of and acknowledge all 'relevant, pertinent, and non-privileged facts, or the knowledge of the whereabouts of such facts' and are able thereby to prepare their cases properly and efficiently, the discovery rules are intended to be liberally construed.

*North River Ins. Co. v. Mayor and City Counsel of Baltimore,* 343 Md. 34, 83–84, 680 A.2d 480 (1996).

Our system of comprehensive discovery would be meaningless without some manner of enforcement. Accordingly, the discovery rules allow sanctions for non-compliance. *See* Md. Rule 2–433. Imposition of attorney's fees is a sanction that may be imposed under Rule 2–433:

(c) *Award of expenses.* If a motion filed under Rule 2–432 or under Rule 2–403 is granted, the court, after opportunity for hearing, shall require the party or deponent whose conduct necessitated the motion or the party or the attorney advising the conduct or both of them to pay to the moving party the reasonable expenses incurred in obtaining the order, including attorney's fees, unless the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust.

The Court of Appeals has explained, referring to a predecessor rule, that the sanctions provided for in the Rules are intended to insure that litigants comply with the discovery rules. *See Kelch v. Mass Transit Admin.,* 287 Md. 223, 229, 411 A.2d 449 (1980).

It is well settled in Maryland that the trial judge, who is entrusted with the role of administering the discovery rules, is vested with broad discretion in imposing sanctions when a party fails to comply with discovery rules. *See, e.g., Starfish Condominium Ass'n v. Yorkridge Serv. Corp., Inc.,*

295 Md. 693, 712, 458 A.2d 805 (1983). A court's decision to impose a sanction will not be disturbed unless there has been a clear abuse of discretion. *See, e.g., Mason v. Wolfing,* 265 Md. 234, 236, 288 A.2d 880 (1972).

## II.

### Jurisdiction to Sanction

Appellants' first contention is that the trial court lost its jurisdiction to rule on the issue of sanctions after it entered the final judgment in the underlying tort action. They claim that it was error for the trial judge to rule on a "pre-judgment" motion in a "post-judgment" order. We disagree.

Generally, jurisdiction of a trial court with regard to a specific case ends upon enrollment of a final judgment, which occurs thirty days after its entry. *See Chapman v. Kamara* 118 Md.App. 418, 433, 702 A.2d 977 (1997), *cert. granted,* 349 Md. 236, 707 A.2d 1330 (1998); *Eisenbeiss v. Jarrell,* 52 Md.App. 677, 685, 451 A.2d 940 (1982), *cert. denied,* 295 Md. 301 (1983). This rule does not, however, preclude a trial court from entertaining a collateral or independent matter. *See Dent v. Simmons,* 61 Md.App. 122, 129, 485 A.2d 270 (1985). "Only those . . . orders which affect the ' "meat," or subject matter of [the case]' have been prohibited." *Id.* at 130, 485 A.2d 270 (quoting *Lang v. Catterton,* 267 Md. 268, 285, 297 A.2d 735 (1972) (citation omitted)).

In *Dent,* we considered whether a trial court could enter a judgment awarding attorneys' fees more than thirty days after it had entered a final judgment in the underlying action. The underlying action was on appeal to this Court. We held that the circuit court could enter such judgment because it "raised legal issues collateral to the main cause of action" which would "not affect the subject matter of the appeal. . . ." *Id.*

In *Legal Aid Bureau, Inc. v. Farmer,* 74 Md.App. 707, 539 A.2d 1173 (1988), we analyzed whether an award against an attorney was a collateral matter. There, a sanction was awarded under Rule 1–341 against counsel. To determine

whether we had jurisdiction to review the sanction, we first had to find whether the issue was collateral. We held, with regard to an award against counsel, that "a judgment entered by the circuit court against the attorney is sufficiently collateral to the underlying action as to fall within our baliwick." *Id.* at 712, 539 A.2d 1173.

We also viewed an award for attorneys' fees as a collateral matter in *Johnson v. Wright,* 92 Md.App. 179, 607 A.2d 103 (1992). There, the trial court entered a final judgment by dismissing a counterclaim, which was the last unresolved claim. At the time of dismissal, a request for sanctions under Rule 1–341 was pending. The court eventually denied the request and the plaintiffs filed an appeal based on the merits of the case. The appeal was filed more than thirty days after the entry of judgment in the underlying case, but within thirty days from the denial of sanctions. We dismissed the appeal, explaining that "[t]he pendency of the collateral motion for attorneys' fees did not stay or enlarge the time for taking an appeal from the judgment." *Id.* at 182, 607 A.2d 103.

The Court of Appeals, when analyzing a claim for attorneys' fees under 42 U.S.C. § 1988 in *County Exec. of Prince George's County v. Doe,* 300 Md. 445, 479 A.2d 352 (1984), similarly held that a claim for attorneys' fees is a collateral matter. Judge Eldridge, speaking for the Court, said that "under 42 U.S.C. § 1988, a claim for an attorney's fee, while an integral part of the remedy under 42 U.S.C. § 1983, is viewed as a collateral matter from the § 1983 action; thus the claim for an attorney's fee may be brought following a final judgment in a § 1983 action." *Id.* at 451 n. 4, 479 A.2d 352.

The Court of Appeals revisited the issue in the context of divorce litigation in *Blake v. Blake,* 341 Md. 326, 670 A.2d 472 (1996). There, the Court presented the issue as "whether a claim for counsel fees ... should be treated as part of the claim for relief on the merits...." *Id.* at 336, 670 A.2d 472. The Court quoted dicta from its decision in *Newman v. Reilly,* 314 Md. 364, 550 A.2d 959 (1988), which addressed the issue of whether a Health Claims Arbitration Panel retained jurisdic-

tion to consider a pending sanctions motion after institution of a circuit court action appealing from its decision:

> 'If this problem is governed by analogy to actions in courts, we simply observe that, under the majority rule, an appeal from a trial court judgment on the merits does not deprive the judgment-rendering court of jurisdiction to consider an award of counsel fees.'

*Blake*, 341 Md. at 336, 670 A.2d 472 (quoting *Newman*, 314 Md. at 379–80 n. 12, 550 A.2d 959) (citations omitted). The *Blake* Court, citing many of the above cases, held that counsel fees were a collateral matter, even when those fees were awarded pursuant to statutory authority such as that found in Maryland Code (1984, 1991 Repl.Vol., 1995 Cum.Supp.), §§ 11–110, 12–103 of the Family Law Article. It quoted the Supreme Court decision in *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 202–03, 108 S.Ct. 1717, 1722, 100 L.Ed.2d 178 (1988), holding that " 'a decision on the merits is a "final decision" ... whether or not there remains for adjudication a request for attorney's fees attributable to the case.' "

The Supreme Court also addressed the issue in *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395, 110 S.Ct. 2447, 2455, 110 L.Ed.2d 359 (1990), recognizing that collateral issues—such as costs, attorneys' fees, and contempt sanctions are under the jurisdiction of a court "after an action is no longer pending." The Supreme Court further explained:

> Like the imposition of costs, attorney's fees, and contempt sanctions, the imposition of a ... sanction is not a judgment on the merits of an action. Rather, it requires the determination of a collateral issue: whether the attorney has abused the judicial process, and, if so, what sanction would be appropriate. Such a determination may be made after the principal suit has been terminated.

*Id.* at 396, 110 S.Ct. at 2456.

■ We see no reason to depart from the rules enunciated in the above cases solely because the award for attorneys' fees in this case was the result of a discovery sanction under Rule 2–433. The sanction was clearly collateral to the merits of the

tort action and the trial court did not surrender jurisdiction to rule on this matter when the final judgment was entered in the tort action.[3]

## III.

### Deposition Comments and Conduct of Appellants

Appellants next contend that Mr. Harris's comments to Ms. Green at Ms. Aude's deposition were not sexist behavior or disruptive to the discovery process. We unequivocally reject this assertion, and with this decision hope to make it crystal clear how this Court views the exhibition of gender bias by lawyers in the litigation process.

### A.

### Strategic Name Calling and Bias

The absence of civility and respect exhibited by lawyers towards one another has been for years the subject of significant concern for bar and bench leaders. In the words of Judge Paul L. Friedman of the United States District Court for the District of Columbia:

> Although the 'modern age' of the legal profession has witnessed progress in opening its doors wider to women and minorities and others who were previously excluded, this age has also opened its doors to the 'Rambo litigator' which has spawned a generation of lawyers, too many of whom think they are more effective when they are more abrasive.

Hon. Paul L. Friedman, *Fostering Civility: A Professional Obligation,* http://www.abanet.org/contract/operations/pro-

---

**3.** We do not retreat from our earlier admonition that "[a]lthough [a] request for attorney's fees [often raises] legal issues collateral to the main cause of action, the better practice in most cases would be to determine those issues before judgment becomes final on the case in chief, in order to avoid successive appeals." *Dent,* 61 Md.App. at 130, 485 A.2d 270 (citation omitted). We recognize that some issues relating to awards may be complex; thus, we leave the ultimate decision on when to determine them to the sound discretion of our trial judges. *See id.*

ceedings/sigdocs/friedman13mar98.html (remarks given at an American Bar Association meeting). Clients, not lawyers, are the litigants, and when the ill feeling that may exist between litigants carries over into the conduct and demeanor demonstrated by one lawyer toward another, the legal profession is diminished. *See, e.g.,* Annotation, Attorney's Verbal Abuse of Other Attorney Action, 87 A.L.R. 3rd 351, 354 (1978) (relying on Canon No. 17 of the Canons of Professional Ethics).[4] Again, we borrow from Judge Friedman:

> '[S]corched earth' strategies, and so-called 'take no prisoners' litigators are in vogue.... [J]udges have an obligation to step in and say it is unacceptable; it will not be tolerated. We see it even more frequently in depositions, a forum in which there is no referee, no umpire, no judge to call a halt to the ad hominem attacks, the harassment, the abuse that too many lawyers today think is required in the service of their clients.

Some attorneys engage in actively undermining another attorney's case by using gender. This strategy has been aptly termed "sexual trial tactics." Lynn Hecht Schafran, *Women as Litigators: Abilities vs. Assumptions,* 19 Trial 36, 38 (August 1983) (quoting Jill Wine–Banks, Esq.); *see also* Kandis Kovstenis, *Sexual Trial Tactics,* 4 Geo. J. Legal Ethics 153 (1990). Schafran observed:

> Like their male counterparts, women litigators run the gamut from inspired to inept, with styles ranging from understated to flamboyant, from ingratiating to brusque.

---

**4.** The current Maryland Rules of Professional Conduct do not explicitly set forth this concept. The Preamble to these Rules, titled "A lawyer's responsibilities", provides that "[a] lawyer should demonstrate respect for the legal system and for those who serve it, including judges, other lawyers and public officials." A similar concept was included in the Code of Civility adopted by the Maryland State Bar Association. This group of written principles includes as the first item:

> We will treat all participants in the legal process, in a civil, professional, and courteous manner and with respect at all times and in all communication, whether oral or written.... We will refrain from acting upon or manifesting racial, gender, or other bias or prejudice toward any participant in the legal process.

Society, however, is still so steeped in gender-based stereo-types about the 'true nature' and 'proper roles' of women that it often is difficult for those with whom women litiga-tors come into professional contact to deal with them as individuals, on the basis of ability, rather than on the basis of assumptions. These assumptions are false, lead to insult-ing behavior, and directly undermine women litigators' cred-ibility, professionalism, and ability to represent their clients.

Schafran, *supra*, at 36.

Mr. Harris's behavior with respect to Ms. Aude and her counsel at the deposition was a crass attempt to gain an unfair advantage through the use of demeaning language, a blatant example of "sexual [deposition] tactics." With respect to the effect on the profession, we think Judge Waldron stated it well when he said: "These actions ... have no place in our system of justice and when attorneys engage in such actions they do not merely reflect on their own lack of professionalism but they disgrace the entire legal profession and the system of justice that provides a stage for such oppressive actors."

■ Appellants refused to acknowledge, in their brief or at oral argument, that it was derogatory for Mr. Harris to address Ms. Green as "babe," during a deposition. They unblushingly ask this Court to construe Mr. Harris's use of the term "babe" as a term of endearment because it is "a nickname for 'Babe' Ruth, a towering athletic figure and an American folk hero, and 'Babe' Didrickson, an outstanding and multi-talented female athlete...." They contend that the term "indicates approval, [and] is a sign of approbation." Thus, they say, Mr. Harris's "calling someone 'babe' would to him not in any way be a derogatory act, but would at least imply a commendatory opinion of the person so addressed." We find this argument singularly unpersuasive. If Ms. Green, when up to bat at the annual Bar Association softball tourna-ment, hit a home run, and in that context Mr. Harris chose to call her "Babe," this argument *might* be plausible. In the context of this case, however, we can only characterize the argument as disingenuous.

Lest there be any doubt about Mr. Harris's intended meaning when he addressed Ms. Green as "babe," we need look no further than the transcript of the deposition. When Ms. Green asked him to refrain from the use of that term, Mr. Harris responded: "At least I didn't call you a bimbo." To our knowledge, neither Babe Ruth nor Babe Didrickson was endearingly addressed as "bimbo."

Let us move from common sense to the dictionary. The term "babe" is defined as:

1. a baby or child. 2. an innocent or inexperienced person. 3. *(usually cap.) Southern U.S.* (used, often before the surname, as a familiar name for a boy or man, esp. the youngest of a family.) 4. *Slang.* a. *Sometimes Disparaging and Offensive.* a girl or woman, esp. an attractive one. b. *(sometimes cap.)* an affectionate or familiar term of address (sometimes offensive when used to [address] strangers, casual acquaintances, subordinates, etc., esp. by a male to a female).

*The Random House Dictionary of the English Language,* at 148 (2d ed. unabridged 1987). The term "bimbo" is defined as: "1. a foolish, stupid, or inept person. 2. a man or fellow, often a disreputable or contemptible one. 3. *a disreputable woman; tramp; whore."* *Id.* at 208. When used to address another attorney in the context of a discovery deposition or court proceeding, all of the dictionary definitions of the word "babe" are gender biased and derogatory.[5]

To explain further why this conduct is objectionable, we briefly review the study of gender bias in the court system. In 1987, former Chief Judge Robert Murphy appointed a Special Joint Committee on Gender Bias in the Courts, which resulted in the *1989 Report of the Special Joint Committee on Gender Bias in the Courts* prepared after extensive public hearings and research. The Committee reported that "[f]e-male attorneys feel demeaned when they are addressed infor-

---

**5.** The southern colloquial use of "babe" preceding a boy's surname (as in "Babe Jones") to refer to the youngest male of a family, is clearly not applicable to the usage in this case.

mally ... such as "hon," "dear," "baby doll," "honey," and "sweetheart." " *Gender Bias in the Courts*, at 123 (footnote omitted). Professor Karen Czapanskiy of the University of Maryland School of Law aptly explained the nature of the problem presented when she quoted the words of an attorney who reported in a gender bias study from New Jersey:

> I have ... observed the use of a demeaning term of pseudo endearment to belittle and undermine the professionalism of a female attorney. Such terms are used by both ... judges and attorneys, to single out a female attorney and set her on a lower plateau. Rather than a direct attack on the legal issue or the argument advanced, the demeaning term is used to dismiss the female attorney's position or relegate it to a lesser status.

Karen Czapanskiy, *Women in the Legal Profession: 1994, and the Challenges Continue*, 2 Va. J. Soc. Pol'y & L. 13 (1994) (quoting *New Jersey Supreme Court Task Force on Women in the Courts, The First Year Report* (1984)).

Ms. Green and Mr. Harris were opposing counsel in litigation involving a highly sensitive and sexually charged topic— the negligent or intentional spreading of the herpes virus from a male defendant to a female plaintiff through sexual contact. In the midst of a deposition, Mr. Harris first made a derogatory remark about the plaintiff when she left the room to retrieve a document which was located in her car—a remark that allowed various insulting inferences. When Ms. Green observed that the comment was in poor taste and asked him to refrain from further derogatory comments, Mr. Harris responded by insulting Ms. Green, suggesting that her personal standards for defining good taste were extremely low. When Ms. Green confronted this direct slur with a question as to whether he "had a problem with" her, he responded: "No, I don't have any problem with you, babe."

If Mr. Harris, by the use of such tactics, can evoke in Ms. Green any emotional response that puts her off-balance, makes her defensive, makes her feel inadequate, or just plain angry and distracted, he has succeeded with his strategy. In

so doing, he likely has interfered with the discovery process.[6] While strategy and tactics are part of litigation, and throwing your adversary off-balance may well be a legitimate tactic, it is not legitimate to do so by the use of gender-based insults.

Mr. Harris defends his action by including in the record copies of advertisements in which Ms. Green held herself out to be a "hardball" attorney. At oral argument, counsel suggested that if she advertises herself as "hardball," she should expect some "rough and tumble" [7] experiences during the course of litigation. This incident, he posits, was simply that. Mr. Harris and his counsel widely miss the mark with this argument. There is no doubt that with our adversarial system of justice, lawyers who choose to litigate must withstand pressure, adversity, and the strategic maneuvers of their opponent. Fortunately, however, we have long passed the era when bias relating to sex, race, religion, or other specified groups is considered acceptable as a litigation strategy. *See* U.S. Const. amend. XIV; Md. Decl. of Rts. arts. 46, 36. The Maryland Code of Judicial Conduct mandates that "[a] judge shall require lawyers in proceedings before the judge to refrain from manifesting, by words or conduct, bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation or socioeconomic status, against parties, witnesses, counsel or others." Maryland Rule 16–813, Canon 3(A)(10). We think that the trial court, in finding that Mr. Harris's conduct exhibited gender bias in a deposition, acted in a manner consistent with the directives of this Canon.

The imposition of sanctions under these circumstances reinforces the commitment of the judicial system to impartiality. "Whether it is men or women who experience the burden of

---

6. We note that there is no requirement that a movant under Rules 2–403 and 2–433 demonstrate that discovery was actually encumbered. It is sufficient under Rule 2-403 that the movant show "annoyance, embarrassment, oppression, or undue burden or expense...." Rule 2–433(c) only requires that the movant show that a motion filed under Rule 2–403 was granted.

7. The term "rough and tumble" is a paraphrase of the words used by counsel at argument.

bias ... the public has an interest because the judicial system has failed to adhere to the highest standards of fairness and impartiality." *Gender Bias in the Courts*, at 131. This concept was well stated by the Supreme Court of New York when it was presented with a request for sanctions relating to gender-biased insulting remarks [8] made to counsel during depositions:

Seeking sanctions from this court is not a display of an inability to overlook obnoxious conduct, but an indication of a commitment to basic concepts of justice and respect for the mores of the profession of law. The movant has turned to the court to give force to a basic professional tenet.

*Principe v. Assay Partners*, 154 Misc.2d 702, 586 N.Y.S.2d 182, 186 (1992).

We hold that the trial judge was correct in finding that appellants' conduct properly fell within the purview of Rule 2–403. Such conduct forms a proper basis not only for a protective order, but an award of attorneys' fees under Rule 2–433 as well.

## B.

### Harassment of Expert Witness

We next address appellants' alleged harassment and intimidation of plaintiff's expert witness, Dr. Aurelian. Appellee alleges that appellants' conduct was an attempt to encumber discovery. In an affidavit filed with appellee's motion for protective order, Dr. Aurelian stated that she felt intimidated, harassed, and had reached the point where she would rather not testify. She explained that she received threatening and

---

**8.** A male attorney made the following comments to an opposing female attorney during a deposition:

"I don't have to talk to you, little lady";

"Tell that little mouse over there to pipe down";

"What do you know, young girl";

"Be quiet, little girl";

"Go away, little girl."

*Principe v. Assay Partners*, 154 Misc.2d 702, 586 N.Y.S.2d 182, 186 (1992).

harassing telephone calls and that appellants filed complaints against her with the Maryland Department of Health and Mental Hygiene and the University of Maryland.

At the sanctions hearing, Ms. Green explained that Dr. Aurelian refused to testify and relayed the content of Dr. Aurelian's affidavit over the objection of appellants. Both Mr. Mullaney and Mr. Harris were called as witnesses and denied all allegations of harassment and intimidation of Dr. Aurelian.

█ It is unclear whether the trial judge relied on the facts from the affidavit in his ruling.[9] In his Memorandum and Order ruling on the sanctions issue, he stated:

> There was sufficient information in the Motion and the accompanying exhibits which included the ... copies of correspondence reflecting the Defendant's attempt to jeopardize the Plaintiff's expert's position at her place of employment to form a basis for and support Judge Carr's ruling in granting the Plaintiff's Motion. The testimony taken before this [c]ourt further supported a finding of abusive behavior undertaken in the course of discovery for which the granting of the 2–403 Protective Order was justified and necessary.

There may well have been sufficient information in the motion and affidavit to justify the issuance of a protective order pursuant to Rule 2–403 ordering appellants to cease having any contact with Dr. Aurelian and the regulatory and professional associations with which she is associated. *See* Md. Rule 2–403 ("On motion of a party or of a person from whom discovery is sought, and for good cause shown, the court may enter any order that justice requires to protect a party or person from annoyance, embarrassment, oppression or undue burden. . . ."). A protective order may be issued based on an affidavit, and there is no requirement for a hearing. *See id.*

█ What we are reviewing here, however, is the propriety of an award of attorneys' fees to appellee based on the

---

**9.** He only noted appellants' objection and allowed Ms. Green's testimony.

expenses incurred in obtaining the protective order. When attorneys' fees are awarded under Rule 2–433 because of the granting of a motion for protective order under Rule 2–403, an opportunity for a hearing is required prior to the award. *See* Md. Rule 2–433(c). At such hearing, where the facts are disputed, the court cannot rely upon an affidavit to rebut testimony of a witness.

The issue reached the trial court in a procedurally unusual fashion because Judge Carr granted the protective order without knowing that appellants filed an answer to appellee's motion. Thus, Judge Waldron, in the sanction hearing, reviewed the validity of Judge Carr's previous protective order, as well as decided whether sanctions should be imposed. The latter decision was governed by Rule 2–433(c), providing that

> the court, after opportunity for hearing, shall require the party ... whose conduct necessitated the motion ... to pay to the moving party the reasonable expenses incurred in obtaining the order, including attorney's fees unless the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust.

Dr. Aurelian did not testify at the hearing. Rather, over appellants' objection, Ms. Green read from Dr. Aurelian's affidavit and said that Dr. Aurelian refused to attend. Without the testimony of Dr. Aurelian, there was no admissible evidence of harassing or intimidating telephone calls to her. The testimony of Ms. Green reiterating facts from the affidavit was not admissible because it does not fall within a hearsay exception. *See* Md. Rule 5–804. Dr. Aurelian was not unavailable according to the definition of "unavailability" in the Rule—she apparently refused to testify, but she did not refuse under a court order as the Rule requires. *See* Md. Rule 5–804(a)(2).[10] Accordingly, the testimony concerning the facts alleged in Dr. Aurelian's affidavit was hearsay. Further, none

---

**10.** Ms. Green acknowledged that she failed to subpoena Dr. Aurelian, and there was no order compelling her testimony.

of the hearsay exceptions in Rule 5–803 applies. Thus, admission of the contents of the affidavit at the hearing was error.

As indicated previously, it is not clear that the trial court relied upon the contents of Dr. Aurelian's affidavit in reaching its conclusion that appellants "attempt[ed] to jeopardize the Plaintiff's expert's position at her place of employment." In concluding that the protective order had been validly issued, the trial court alluded to "the Motion and the accompanying exhibits" and expressly referenced the correspondence to the Department of Health and Mental Hygiene and the University of Maryland, and testimony of both appellants who denied such allegations.

Because the trial court may have erroneously considered the affidavit in its conclusion, we remand to the circuit court without affirming or reversing the counsel fee award. Upon remand the court, in its discretion, may decide that the $1,500 attorneys' fees award was justified based upon the conduct at the deposition, without further consideration of whether appellants' conduct with respect to Dr. Aurelian was the proper subject of a protective order. If the court does not consider the sanction justified based only on the deposition conduct, it should determine whether the opposition to that portion of the motion relating to Dr. Aurelian was justified, and may, in its discretion, hear supplemental evidence regarding the appellants' conduct toward Dr. Aurelian.[11] If the court decides that appellants' opposition to the motion was substantially justified, it should determine the appropriate expenses and attorneys' fees that are warranted for obtaining the protective order with respect to the deposition conduct alone, and enter judgment accordingly.

---

11. If the trial court elects to hold a hearing, we suggest that it examine the letters written by Mr. Mullaney to the Department of Health and Mental Hygiene, Complaint and Quality Assurance Unit, and the University of Maryland, to determine whether the right of a person under the First Amendment to the United States Constitution to petition a government agency for redress of a grievance is implicated. *See Miner v. Novotny*, 60 Md.App. 124, 129, 481 A.2d 508 (1984), *aff'd*, 304 Md. 164, 498 A.2d 269 (1985).

## IV.

## Calculation of Amount of Award

Appellants argue that the evidence before the trial court was insufficient to support the dollar amount of the award, relying on *Davis v. Davis,* 97 Md.App. 1, 627 A.2d 17 (1993), *aff'd,* 335 Md. 699, 646 A.2d 365 (1994). Appellee suggests that the motion for protective order, her presence in the courtroom, and testimony supplied the necessary facts to support the award.

In issuing the sanction, the trial judge stated:

Accordingly, pursuant to Maryland Rule of Procedure 2–433(c), this [c]ourt shall require the Defendant and Alan E. Harris, his attorney, to pay to the Plaintiff the reasonable attorney's fees incurred in obtaining the [Protective] Order, including the fees related to the hearing on this Motion. This [c]ourt finds that an hourly rate of $125.00 per hour is fair and reasonable and that the Plaintiff's attorneys spent at least twelve (12) hours in the preparation of the Motion, the follow-up correspondence with the [c]ourt, the preparation for hearing, and the attendance at the hearing in open court on this Motion. Thus, reasonable attorney's fees equal $1,500.00.

The trial court based the fee amount on the time spent in the courtroom, plus its assessment of how long it would reasonably take to prepare the motion for protective order. We agree that in an award under Rule 2–433, the amount of the award may be determined from those factors.[12]

Trial judges are in the best position to know, from their experience on and off the bench, what constitutes a reasonable hourly rate for attorneys in their jurisdiction. *See*

---

**12.** An award under this Rule is unlike an award in cases involving claims for attorneys' fees and expenses as damages for a breach of contract, when the moving party must prove its claim for attorneys' fees with competent evidence. *See Holzman v. Fiola Blum, Inc.,* 125 Md. App. 602, 638–39, 726 A.2d 818 (1999) (citing *Maxima Corp. v. 6933 Arlington Dev. Ltd. Partnership,* 100 Md.App. 441, 452, 641 A.2d 977 (1994)).

*Jenkins v. Cameron & Hornbostel,* 91 Md.App. 316, 337, 604 A.2d 506, *cert. denied,* 327 Md. 218, 608 A.2d 780 (1992). In reviewing a sanction under Rule 1–341 in *Jenkins,* we stated that the amount of the award is historically left to the trial judge's " 'own knowledge of the case and the legal effort and expertise required.' " *Id.* (quoting *Johnson v. Baker,* 84 Md.App. 521, 528, 581 A.2d 48 (1990)).

In a more complicated case, where the award is based on extensive work performed outside the courtroom, and the work product is not directly visible to the judge, a court should have detailed time records and a description of work performed. *See, e.g., Milton Co. v. Council of Unit Owners of Bentley Place Condominium,* 121 Md.App. 100, 121, 708 A.2d 1047, *aff'd,* 354 Md. 264, 729 A.2d 981 (1999) (affirming $500,000 in attorneys' fees awarded under the Consumer Protection Act based on compilation of time records and expert testimony). In a case like the present one, however, with a relatively small award, based on time spent by the attorney preparing a motion for protective order and actual attorney time in court, the court acted within its discretion in determining the award without specific time records. *See id.* (stating that "the chancellor may rely upon his own knowledge and experience in appraising the value of an attorney's services."). As we said in *Milton,* " '[A] trial court enjoys a large measure of discretion in fixing the reasonable value of legal services. That amount will not be disturbed unless it is clearly an abuse of discretion.' " *Id.* (quoting *Head v. Head,* 66 Md.App. 655, 669, 505 A.2d 868 (1986)) (citations omitted).

In *Davis,* relied upon by appellant, we reviewed a trial court's decision not to grant attorney's fees. In doing so, we reiterated that " '[t]he amount of the attorney's fees award is within the discretion of the chancellor.' " *Davis,* 97 Md.App. at 25, 627 A.2d 17 (quoting *Broseus v. Broseus,* 82 Md.App. 183, 200, 570 A.2d 874 (1990)). We held that the trial judge did not abuse his discretion in failing to award attorney's fees because the moving party did not request a certain amount or supply information justifying such award.

This case reaches us in a different posture than *Davis;* the court below did exercise its discretion to award fees based on information before it that was sufficient to determine the amount of a reasonable award. In *Davis,* the trial judge may have been unfamiliar with the extent of time and effort put forth by the attorney. As such, the judge was unable to award attorneys' fees without a submission of documentation to support the award. Neither case is an abuse of discretion.

As indicated previously, because the trial court relied on both the gender bias issue and the harassment of the expert witness in awarding attorneys' fees, we remand the case for further consideration by the trial court, and in its discretion, for further proceedings.

## V.

### Motion to Revise

Appellants' final contention is that the ruling by Judge Carr on November 16, 1995, as to the protective order, was based upon the erroneous assumption that appellants had not answered the appellee's motion for protective order. Judge Carr, in his letter, stated, "As of the date of this letter no response has been filed to the motion." On March 13, 1998, appellants filed a motion for the court to exercise its revisory power and control over its letter order dated November 16, 1995. Appellants argue that their response to the protective order was timely filed and, due to an error in the clerk's office, Judge Carr did not have the benefit of appellants' motion. As such, appellants requested the court to strike the order under Rule 2–535(b) and make a full inquiry into the motion. On April 20, 1998, Judge Carr denied appellants' motion for the court to exercise its revisory power.

Appellee asserts that "[a]ppellants waited 2 years 3 months and 25 days before asking Judge Carr to reconsider his November 16, 1995 Letter Order." She claims that Judge Carr did not abuse his discretion by denying the motion. We agree that Judge Carr did not abuse his discretion in denying

the motion, but do not base our decision on the delay in filing the motion, as appellee proposes.

The Court of Appeals has stated that ordinarily it will not review a trial court's decision under Rule 2–535 declining to reopen a legal issue raised at trial. *See Blake v. Blake,* 341 Md. 326, 342, 670 A.2d 472 (1996). In *Hardy v. Metts,* 282 Md. 1, 381 A.2d 683 (1978), the Court stated:

> [W]hen the trial court denies a Rule [2–535] ... request to revise a final judgment ... an appellate court will not ordinarily disturb the trial court's discretionary decision not to reopen the matter; an appeal from the primary judgment itself is the proper method for testing in an appellate court the correctness of such a legal ruling.

*Id.* at 6, 381 A.2d 683. We review the decision of the trial court under the abuse of discretion standard. *See Suber v. Washington Metro. Area Transit Auth.,* 73 Md.App. 715, 723 n. 4, 536 A.2d 142 (1988).

As mentioned previously, appellee filed a motion for protective order on August 15, 1995. Thereafter, appellants filed a timely response that was not forwarded to Judge Carr's chambers in a timely fashion. As such, on November 16, 1995, Judge Carr ruled on the protective order motion without the benefit of appellants' response. The case progressed and ended in a jury verdict. Following the verdict, appellee's counsel sent Judge Waldron a letter requesting a ruling on the reserved issue of sanctions. Judge Waldron conducted a full hearing on the merits of the sanctions issue on May 13, 1997. In a Memorandum Opinion and Order, Judge Waldron imposed the sanction against appellants on February 20, 1998. In a final attempt to escape sanctions, appellants filed a motion to exercise revisory power over Judge Carr's ruling of November 16, 1995. In another motion, appellants correctly acknowledged that, "This case will not win any awards for congeniality between counsel...." The motion was denied by Judge Carr.

Essentially, the hearing held by Judge Waldron on May 13 was a reconsideration by the trial court of the issues

presented in the motion for protective order. Although appellants requested a hearing at the time they filed their response to the motion, they suffered no harm because a hearing was held prior to the imposition of sanctions by the court. Judge Carr's denial of the motion to revise was not an abuse of discretion because Judge Waldron had just completed a review of the same issues.

PROTECTIVE ORDER OF NOVEMBER 16, 1995 AFFIRMED; FEBRUARY 20, 1998 SANCTIONS ORDER NEITHER AFFIRMED OR REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR HARFORD COUNTY FOR DISPOSITION OR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID THREE–QUARTERS BY APPELLANTS IN EQUAL SHARES AND ONE–QUARTER BY APPELLEE.